UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X
                             :

CHAZ PERRY, et al.,                :
                             :

                    Plaintiffs,    :

                             :

           - against -        :

                             :

CITY OF NEW YORK, et al.,    :
                             :

                    Defendants.  :

                             :

-------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _____3/13/2019_____

13-CV-1015 (VSB)

**OPINION & ORDER**

Appearances:

Gregory K. McGillivary
Sara L. Faulman
Diana J. Nobile
Sarah M. Block
Woodley & McGillivary LLP
Washington, DC
*Counsel for Plaintiffs*

Felice B. Ekelman
Jeffrey W. Brecher
Michael A. Frankel
Adam S. Gross
Jackson Lewis P.C.
New York, New York
*Counsel for Defendants*

VERNON S. BRODERICK, United States District Judge:

       Plaintiffs are 2,576 current or former Emergency Medical Technicians ("EMTs"),

Paramedics, and Fire Safety Inspectors below the rank of lieutenant in the New York City Fire

Department (the "FDNY"), and bring this action against Defendants the City of New York and

the FDNY (collectively, "Defendants") to recover unpaid compensation under the Fair Labor

Standards Act (the "FLSA"), 29 U.S.C. § 201 *et seq.* (Am. Compl. ¶ 1.)[1] On March 26, 2018, I granted in part and denied in part Plaintiffs' motion for partial summary judgment, and I granted in part and denied in part Defendants' motion for summary judgment. (SJ O&O.)[2]

Before me is Plaintiffs' motion for a finding that they are similarly situated under the FLSA. (Doc. 180.) Specifically, Plaintiffs request a finding that they are similarly situated in two subgroups: (1) EMTs and Paramedics who are assigned to work on ambulances in the field; and (2) Fire Inspectors. For the reasons that follow, Plaintiffs' motion is GRANTED.

## I.    Background[3]

### A.    *EMTs and Paramedics*

Emergency Medical Services ("EMS") is a bureau of the FDNY. (Booth Aff. ¶ 2.)[4] Almost all of the Plaintiffs fall into the first subgroup, which includes EMTs and Paramedics who are assigned to work "in the field" ("EMTs/Paramedics"). Working "in the field" involves the direct provision of patient care to the public. (*Id.* ¶ 8; *see also* Defs.' 56.1 Stmt. ¶¶ 6, 9, 11– 13.)[5] Generally, when EMTs/Paramedics arrive at worksites, they immediately sign in using the "CityTime" system. (Defs.' 56.1 Stmt. ¶ 144.) EMTs/Paramedics are paid for the time worked during their scheduled shift and any overtime they request and their supervisors approve through the CityTime system. (*Id.* ¶¶ 147–148.)

---

[1] "Am. Compl." refers to the Third Amended Complaint, filed on July 19, 2016. (Doc. 115.)

[2] "SJ O&O" refers to my Opinion & Order on the parties' motions for summary judgment, dated March 26, 2018. (Doc. 168.)

[3] I limit my description of the factual background to only those matters that are relevant to the motion currently under consideration.

[4] "Booth Aff." refers to the Affidavit of Chief James Booth in Support of Defendants' Motion for Summary Judgment, filed on December 7, 2016. (Doc. 137.)

[5] "Defs.' 56.1 Stmt." refers to Defendants' Local Rule 56.1 Statement of Undisputed Material Facts, filed on December 7, 2016. (Doc. 134.)

The EMS Operations Guide governs the conduct of EMTs/Paramedics. (*Id.* ¶¶ 49–51.) EMTs/Paramedics are issued Personal Protective Equipment ("PPE"), which they must bring with them on every assignment. (Defs.' Counter 56.1 Stmt. ¶ 69.)[6] PPE consists of a helmet, gloves, a turnout coat, turnout pants, boots, eye protection, a face mask, and a gas mask with a filer cartridge. (*Id.* ¶ 64.) EMTs/Paramedics are also issued technician kits or bags ("tech bags"), which they also must carry with them on every assignment. (*Id.* ¶ 52.) Tech bags include trauma dressings and bandages, burn sheets, tape, a stethoscope, a blood pressure cuff, an obstetrical kit, saline, face masks, nasal calendulas, airways, and a nebulizer. (*Id.*)

Plaintiffs contend that that the EMS Operations Guide, in combination with other policies and practices that apply to all EMTs/Paramedics, require EMTs/Paramedics to perform work before their regularly scheduled shifts begin ("pre-shift work"), such as checking and preparing equipment, and after their regularly scheduled shifts have ended ("post-shift work"), such as exchanging equipment and/or narcotics, and that Defendants have failed to pay them for this pre- and post-shift work. (Am. Compl. ¶¶ 10–11.)

The EMS Operations Guide requires EMTs/Paramedics to "[r]eport punctually for duty as scheduled, in proper uniform, including their PPE and tech bag, at the start time of their tour ready for duty." (12/7/16 Faulman Decl. Ex. 11;[7] *see also* Defs.' 56.1 Stmt. ¶ 59 ("EMTs and Paramedics are required to be in uniform with their personal equipment, including their PPE and tech bag, at the start time of their tour ready for duty."); Pls.' Mem. 6.)[8] Defendants' Rule

<hr>

[6] "Defs.' Counter 56.1 Stmt." refers to Defendants' Responses to Plaintiffs' Statement of Material Facts as to Which There Is No Genuine Issue to be Tried, filed on January 25, 2017. (Doc. 152.)

[7] "12/7/16 Faulman Decl." refers to the Declaration of Sara L. Faulman, submitted on December 7, 2016. (Doc. 135.)

[8] "Pls.' Mem." refers to Plaintiffs' Memorandum in Support of Their Motion for a Finding that the Plaintiffs Are Similarly Situated Under the Fair Labor Standards Act, filed on July 7, 2018. (Doc. 181.)

30(b)(6) representative testified that this policy requires EMTs/Paramedics to ensure that their equipment is "in good working order," that their PPE does not have any rips or tears, and that cartridges for the gas mask have not expired—all before their shift begins. (Booth Dep. 254:16–255:18;[9] *see also id.* at 161:4–11 (an EMT is not ready for duty without a fully stocked tech bag, and EMTs/Paramedics are not ready for duty without medical equipment and PPE gear); *id.* at 113:13–17 (a good EMT/Paramedic would "inspect their PPE, yes, prior to going out"); Defs.' Counter 56.1 Stmt. ¶ 65 (EMTs/Paramedics must verify that the filter cartridge for the gas mask is sealed, and that the filer is not expired); Ortiz Dep. 34:16–22 ("The main goal is that when their shift starts on that second that they have their gear and their equipment.");[10] Gonzalez Dep. 147:2–5 (EMTs/Paramedics are required to have their equipment checked by the time their shifts start).[11]) Plaintiffs argue that EMTs/Paramedics generally understand that they are required to—and do in fact—perform pre-shift work. (*See* 7/9/18 Faulman Decl. Ex. A (summarizing deposition testimony of thirty-one Plaintiffs).)[12]

Plaintiffs contend that Defendants require EMTs/Paramedics to return certain equipment (such as radios, CO meters, ambulance keys, and tablet computers used to track patient encounters) to their supervisors at the end of their tours; this equipment is then distributed to the EMTs/Paramedics on the next tour. (Gonzalez Dep. 19:14–20:15.) During this turnover,

---

[9] "Booth Dep." refers to the 30(b)(6) Deposition of Defendants by Chief James Booth, dated June 2, 2015, excerpts of which are attached as Exhibit A to the Affirmation of Felice B. Ekelman ("Ekelman Aff."), (Doc. 192), as Exhibit C to Plaintiffs' Memorandum of Law in Support of the motion for a finding that Plaintiffs are similarly situated, (Doc. 181), and as Exhibit B to the 9/6/18 Faulman Declaration. "9/6/18 Faulman Declaration" refers to the Declaration of Sara L. Faulman, submitted September 6, 2018. (Doc. 196).

[10] "Ortiz Dep." refers to the Deposition of Captain Norman Ortiz, dated February 2, 2016, excerpts of which are attached as Exhibit F to the 7/9/18 Faulman Declaration, and as Exhibit G to the Affirmation of Felice B. Ekelman, dated August 23, 2018 ("Ekelman Aff."), (Doc. 192).

[11] "Gonzalez Dep." refers to the Deposition of Jose E. Gonzalez, dated February 8, 2016, excerpts of which are attached as Exhibit E to the 7/9/18 Faulman Declaration, as Exhibit H to the Ekelman Affirmation, and as Exhibit C to the 9/6/18 Faulman Declaration.

[12] "7/9/18 Faulman Decl." refers to the Declaration of Sara L. Faulman, submitted July 9, 2018. (Doc. 181-1.)

Plaintiffs allege that the incoming and outcoming EMTs/Paramedics often engage in an information exchange.  (Pls.' Mem. 9 (citing Booth Dep. 152:5-25, 246:9-22).)  Plaintiffs further argue that, because EMTs/Paramedics are not permitted to return their equipment until after their tour ends, the return must include at least some amount of post-shift work.  (*See* Defs.' Counter 56.1 Stmt. ¶ 76 (admitting that a supervisor testified that EMTs/Paramedics "are not allowed to return their equipment until their tour has ended").)  Similarly, Plaintiffs assert that Paramedics are required to exchange narcotics at the end of a tour, and this exchange involves at least some work outside of regularly scheduled hours for either the outgoing Paramedics or the incoming Paramedics.  (*See* Booth Dep. 237:13–22, 240:2–5 (admitting that the "exchange of equipment, narcotics pouches, keys, radios and/or keys" requires work outside of a shift).)  Defendants admit that, although they know that Paramedics "necessarily perform post-shift work" when they participate in narcotics exchanges, they do not "automatically provide overtime to [P]aramedics for the narcotics exchange."  (*See* Defs.' Counter 56.1 Stmt. ¶ 81.)

## B.   *Fire Inspectors*

The second subgroup is comprised of twenty-nine people who work as either Fire Protection Inspectors or Associate Fire Protection Inspectors (collectively, "Fire Inspectors"), in the Bureau of Fire Prevention.  (Defs.' 56.1 Stmt. ¶ 111.)  The primary job duty of Fire Inspectors is to "conduct field inspections," as part of the Bureau of Fire Prevention's efforts to assist the field firefighting force with inspections, interpretation of codes, methods of enforcement, and other safety issues of concern.  (*Id.* ¶¶ 110, 116.)  Within the Bureau of Fire Prevention, Fire Inspectors may be assigned to various units, such as the Construction, Demolition and Abatement Unit ("CDA Unit") or one the several District Offices.

(McKavanagh Aff. ¶ 4.)[13]  Fire Inspectors in the CDA Unit report directly to their first inspection site each day and call the office staff to notify them that they have arrived.  (Cendagorta Dep. 44:11-23, 45:6-46:3.)[14]  Each Friday, these Fire Inspectors manually enter the time they worked during each prior day of that week into the CityTime system.  (*Id.* at 60:23-61:11, 62:3-20.)  Fire Inspectors in the District Offices report to the office, where they sign in using the CityTime system.  (Tripodi-Azer Dep. 58:14-17.)[15]  These Fire Inspectors sign into CityTime each morning and enter the time they ended work the previous day, (*id.* at 58:18-24), and so their time is ultimately recorded in CityTime, (Defs.' 56.1 Stmt. ¶ 132).  The Fire Inspectors who were deposed during Phase I discovery testified that Fire Inspectors perform uncompensated work. (Pls.' Mem. 14; *see also, e.g.*, Herndon Dep. 31:13-17; Ogunbiyi Dep. 33:21-25.)[16]

## II.     Procedural History[17]

On February 4, 2014, I approved the parties' joint stipulation agreeing to focus discovery initially on a limited set of Plaintiffs, representing approximately five percent of the total number of Plaintiffs (the "Phase I Plaintiffs") during the first phase of discovery.  (Doc. 31.)  During Phase I discovery, Defendants deposed thirty-eight Phase I Plaintiffs, and Plaintiffs deposed seven Rule 30(b)(6) witnesses, as well as three non-party fact witnesses.  (Ekelman SJ Aff. ¶¶

---

[13] "McKavanagh Aff." refers to the Affidavit of Chief Thomas E. McKavanagh in Support of Defendants' Motion for Summary Judgment, filed on December 7, 2016.  (Doc. 139.)

[14] "Cendagorta Dep." refers to the 30(b)(6) deposition of Louis Cendagorta, dated December 11, 2015, excerpts of which are attached as Exhibit D to the Ekelman Affirmation.

[15] "Tripodi-Azer Dep." refers to the 30(b)(6) deposition of Cindee Tripodi-Azer, dated December 11, 2015, excerpts of which are attached as Exhibit E to the Ekelman Affirmation.

[16] "Herndon Dep." refers to the deposition of William Michael Herndon, dated December 12, 2015, excerpts of which are attached as Exhibit PP to the Ekelman Affirmation.  "Ogunbiyi Dep." refers to the deposition of Paul Ogunbiyi, dated January 18, 2016, excerpts of which are attached as Exhibit OO to the Ekelman Affirmation.

[17] I limit my description of the procedural history to only those matters that are relevant to the motion currently under consideration.

11, 12.)[18]  Following these depositions and other discovery, Plaintiffs filed their Third Amended

Complaint on July 15, 2016.  (Doc. 115.)

On December 7, 2016, Plaintiffs filed a motion for partial summary judgment, (Doc.

130), and Defendants filed a cross-motion for summary judgment, (Doc. 132).  On March 26,

2018, I granted in part Plaintiffs' motion with regard to their argument that meal allowances

should be included as part of the regular rate of pay, and I granted in part Defendants' motion,

finding that twenty-nine Plaintiffs who had filed bankruptcy petitions but had failed to report this

litigation as a claim were estopped from bringing their claims in this action.  (Doc. 168.)

During a status conference on June 19, 2018, I requested briefing on the issue of whether

Plaintiffs are similarly situated under the FLSA.  (Doc. 183.)  On July 9, 2018, Plaintiffs filed a

motion for a finding that Plaintiffs are similarly situated, (Doc. 180), and a memorandum of law

in support of the motion with several exhibits, (Doc. 181).  On August 23, 2018, Defendants

filed their memorandum of law in opposition, (Doc. 188), a declaration in opposition, (Doc.

189), two affidavits in opposition, (Docs. 190–91), and an affirmation in opposition, (Doc. 192).

Plaintiffs filed their reply memorandum in support, (Doc. 195), and reply affidavit, (Doc. 196),

on September 6, 2018.

### III.    <u>Legal Standard</u>

Courts in this Circuit use a two-step method to assess whether to certify an FLSA

collective action.  *Myers v. Hertz Corp.*, 624 F.3d 537, 554–55 (2d Cir. 2010).  At the first stage,

plaintiffs typically "make a 'modest factual showing' that they and potential opt-in plaintiffs

'together were victims of a common policy or plan that violated the law.'"  *Id.* at

---

[18] "Ekelman SJ Aff." refers to the Affirmation of Felice B. Ekelman in Support of Defendants' Motion for Summary
Judgment, filed on December 7, 2016.  (Doc. 136.)

555 (quoting *Hoffmann v. Sbarro, Inc.*, 982 F. Supp. 249, 261 (S.D.N.Y. 1997)).  This is a "case management tool for district courts to employ in appropriate cases," but it is not required for the existence of a representative action under the FLSA.  *Id.* at 555 n.10 (internal quotation marks omitted).

At the second stage—the current posture of this litigation—"the district court will, on a fuller record, determine whether a so-called 'collective action' may go forward" by determining whether all plaintiffs in the action are in fact "similarly situated" to the representative plaintiffs.  *Id.* at 555 (citation omitted).  "If the record shows all putative class members are similarly situated, . . . the collective action is . . . certified, and the matter proceeds to trial."  *Morano v. Intercontinental Capital Grp., Inc.*, No. 10 CV 2192(KBF), 2012 WL 2952893, at *6 (S.D.N.Y. July 17, 2012) (internal quotation marks omitted).

At this stage, the representative plaintiffs bear the burden of establishing that all plaintiffs are similarly situated.  *Indergit v. Rite Aid Corp.*, 293 F.R.D. 632, 639 (S.D.N.Y. 2013).  Although "the standard is higher at this second stage, the 'similarly situated' requirement of 29 U.S.C. § 216(b) is considerably less stringent than the requirement of Fed. R. Civ. P. 23(b)(3) that common questions 'predominate.'"  *Alonso v. Uncle Jack's Steakhouse, Inc.*, No. 08 Civ. 7813 (DAB), 2011 WL 4389636, at *3 (S.D.N.Y. Sept. 21, 2011) (internal quotation marks omitted).  "All that is required is a persuasive showing that the original and opt-in plaintiffs were common victims of a FLSA violation pursuant to a systematically-applied company policy or practice such that there exist common questions of law and fact that justify representational litigation."  *Pefanis v. Westway Diner, Inc.*, No. 08 Civ. 002(DLC), 2010 WL 3564426, at *4 (S.D.N.Y. Sept. 7, 2010).  In deciding whether to grant final certification of an FLSA collective action, courts in this Circuit examine three factors:  "(1) disparate factual and

employment settings of the individual plaintiffs; (2) defenses available to defendants which appear to be individual to each plaintiff; and (3) fairness and procedural considerations counseling for or against [collective action treatment]." *Indergit*, 293 F.R.D. at 639 (quoting *Zivali v. AT & T Mobility, LLC*, 784 F. Supp. 2d 456, 460 (S.D.N.Y. 2011)); *accord McGlone v. Contract Callers, Inc.*, 49 F. Supp. 3d 364, 367 (S.D.N.Y. 2014).

## IV.    Discussion

Plaintiffs contend that Defendants violated the FLSA in three ways, by: "(1) suffering or permitting [P]laintiffs to work before and after their scheduled shifts and failing to compensate [P]laintiffs for such work activities, despite having recorded such time, (2) failing to include in the regular rate at which overtime is paid shift differentials and other types of payments made to [P]laintiffs in addition to [P]laintiffs' basic pay, and (3) failing to pay overtime at the rate of time and one-half overtime for all hours worked over forty in a workweek." (Am. Compl. ¶ 10; *see also* Pls.' Mem. 2.) Plaintiffs contend that members of each of the two subgroups are similarly situated with respect to all three of these claims. (Pls.' Mem. 2–4.) Plaintiffs argue that the second and third claims are "simple mathematical claims" that "will be resolved" through either competing expert witness testimony or a stipulation reached by the parties. (*Id.* at 4.) In their opposition papers, Defendants only address whether Plaintiffs are similarly situated with regard to the first claim; therefore, Defendants concede that Plaintiffs are similarly situated with regard to the other two claims. (*See generally* Defs.' Opp.;[19] *see also Gortat v. Capala Bros., Inc.*, No. 07-CV-3629(ILG), 2010 WL 1423018, at *11 (E.D.N.Y. Apr. 9, 2010) (arguments not made in an opposition brief are conceded), *aff'd*, 568 F. App'x 78 (2d Cir. 2014).) Therefore, I find that

---

[19] "Defs.' Opp." refers to Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for a Finding that Plaintiffs Are Similarly Situated, filed on August 23, 2018. (Doc. 188.)

Plaintiffs are similarly situated with regard to the second and third claims, and I focus my inquiry on whether the two subgroups of Plaintiffs are similarly situated with regard to the claim that Defendants suffered or permitted them to do pre- and post-shift work without compensation.

Plaintiffs' argument regarding the first claim—and Defendants' response—seems to conflate three separate arguments. First, Plaintiffs argue that Defendants have a policy or practice requiring all Plaintiffs to perform pre- and post-shift work without compensation. (*See generally* Pls.' Mem. 6–13.) If Plaintiffs were to ultimately succeed on this theory, they would not need to prove that each Plaintiff's supervisor had actual or constructive knowledge of the pre- and post-shift work. *See Zivali*, 784 F. Supp. 2d at 468 ("In the absence of a company-wide policy or practice, plaintiffs will have to demonstrate that each individual manager had actual or constructive knowledge that plaintiffs were performing off-the-clock work without proper compensation."); *see also Briceno v. USI Servs. Grp., Inc.*, No. 09-CV-4252 (PKC), 2015 WL 5719727, at *10 (E.D.N.Y. Sept. 29, 2015) (finding that, where plaintiffs had "shown that Defendants had a company-wide practice" requiring off-the-clock work, they did not need to "demonstrate that each manager had knowledge that employees were performing off-the-clock work without being compensated"). Second, Plaintiffs contend that the CityTime system accurately recorded all uncompensated pre- and post-shift work performed by Plaintiffs. This contention seems to suggest an argument that, even if Defendants did not have a policy or practice requiring pre- and post-shift work, they had knowledge of all pre- and post-shift work performed by Plaintiffs through the CityTime system. (*See* Pls.' Mem. 12.) Third, in the alternative, Plaintiffs' contention that Plaintiffs' supervisors observed and/or were informed by Plaintiffs of the pre- and post-shift work seems to suggest an argument that, even if Defendants did not have a policy or practice requiring pre- and post-shift work, and even if the CityTime

system did not accurately record all pre- and post-shift work, each Plaintiff's supervisor had actual or constructive knowledge of each Plaintiff's pre- and post-shift work, and therefore Defendants had an obligation to compensate Plaintiffs. (*See* Pls.' Mem. 10–11.) I addressed all three of these issues in my Opinion & Order on the parties' motions for summary judgment, and I found that there were triable issues of fact with regard to each of them. (SJ O&O 6–14.)

Relying on *Zivali v. AT & T Mobility*, Defendants argue that the CityTime timekeeping system is legal, and therefore it cannot be the basis for a finding that Plaintiffs are similarly situated. (Defs.' Opp. 16–17 (citing *Zivali,* 784 F. Supp. 2d at 461, 463).) As an initial matter, Defendants' argument misses the mark, because, as discussed above, Plaintiffs do not challenge the use of CityTime as a per se unlawful timekeeping system under the FLSA. Rather, they claim that Defendants' policy or practice of not compensating Plaintiffs for required pre- and post-shift work that is recorded by CityTime is a violation of the FLSA.[20] (Pls.' Reply 4.)

Defendants' reliance on *Zivali* is also misplaced for several additional reasons. First, *Zivali* involved allegations that over 4,000 plaintiffs performed various types of uncompensated off-the-clock work when they were not logged into the timekeeping system. 784 F. Supp. 2d at 460. Conversely, Plaintiffs here allege that they are logged in while performing pre- and post-shift work; therefore, they argue that the uncompensated work is captured by the CityTime system, demonstrating Defendants' knowledge of it. Second, in *Zivali*, the Court determined, and plaintiffs conceded, that the "timekeeping system and formal corporate policies [were] lawful under the FLSA," and that the plaintiffs failed to show that those "lawful policies [were]

---

[20] Defendants argue that CityTime does not accurately record compensable pre- and post-shift work. (Defs.' Opp. 11.) Rather, Defendants argue, Plaintiffs often log in to CityTime and engage in non-work activities while waiting for their shifts to begin. (*Id.*) In my Opinion & Order on the parties' motions for summary judgment, I found that this was a triable issue of fact. (SJ O&O 13–14.) For purposes of this Opinion & Order, I find only that the question of whether CityTime accurately records compensable pre- and post-shift work is appropriately resolved through representative testimony.

consistently violated in practice." *Id.* at 459. Here, Plaintiffs do not concede the legality of Defendants' corporate policies requiring pre- and post-shift work. Third, Defendants claim that they have a policy of providing overtime compensation for work outside of scheduled hours, (Defs.' Opp. 17 (when Defendants become "aware that an employee has worked outside of his or her scheduled hours but did not request overtime compensation in CityTime for such time, it is the City's policy to pay the employee for the overtime worked")), and Plaintiffs argue that such a policy is "consistently violated" in the same way for all Plaintiffs when Defendants fail to pay overtime for pre- and post-shift work that is captured by CityTime. *See Zivali*, 784 F. Supp. at 459. Fourth, Plaintiffs have also made a persuasive showing that the technological limitations of the CityTime system prevent them from requesting compensation for pre- and post-shift work if the work lasts fewer than seven minutes. (Ortiz Dep. 179:6-15 (there is no way for EMTs/Paramedics to ask for overtime for checking their PPE prior to the start of their shifts); *id.* at 178:11-24 (Paramedics "can't make a request" for time worked conducting a narcotics exchange); *id.* at 179:25-180:4 (the "program parameters" prevent EMTs/Paramedics from requesting seven minutes of overtime); Gonzalez Dep. 148:19-149:13 (EMTs/Paramedics cannot request overtime for checking PPE or tech bags because CityTime does not have overtime codes for those activities).) Finally, *Zivali* involved evidence that pointed to "an extremely wide range of company practices in the context of varied factual and employment settings." 784 F. Supp. 2d at 464. Here, Plaintiffs' claims involve relatively few, specifically defined policies or practices in similar employment settings.

## A. *EMTs and Paramedics*

### 1. Factual and Employment Settings

Defendants concede that the EMTs/Paramedics have at least the following similar factual and employment settings: (1) all EMTs/Paramedics have the same primary job duty (direct provision of patient care), (Defs.' Counter 56.1 Stmt. ¶¶ 4–5); (2) all EMTs/Paramedics report to Lieutenants, (Defs.' 56.1 Stmt. ¶ 14); (3) EMTs/Paramedics are assigned to work one of three eight-hour shifts, (*id.* ¶¶ 20, 23); (4) EMTs/Paramedics are assigned to individual ambulances and work with a fellow EMT or Paramedic, (*id.* ¶¶ 27–28); (5) all EMTs/Paramedics' conduct is governed by the EMS Operations Guide, (*id.* ¶¶ 49–50); (6) EMTs/Paramedics are all issued PPE, which consists of a helmet, gloves, a turnout coat, turnout pants, boots, eye protection, a face mask, and a gas mask with a filer cartridge, (Defs. Counter' 56.1 Stmt. ¶ 64); (7) EMTs/Paramedics are all issued technician kits or bags ("tech bags"), which must be carried with them on every assignment, and which include trauma dressings and bandages, burn sheets, tape, a stethoscope, a blood pressure cuff, an obstetrical kit, saline, face masks, nasal calendulas, airways, and a nebulizer, (*id.* ¶ 52); and (8) if EMTs/Paramedics fail to have all required equipment, they are subject to discipline, and Defendants are subject to a fine, *(id.).*

Based on the record before me, I find that Plaintiffs have met their burden of making a "persuasive showing" that a policy or practice of requiring pre- and post-shift work exists. Regarding pre-shift work, EMTs/Paramedics are required to carry their PPE and tech bag on every assignment, (*id.* ¶¶ 52, 69), and Defendants' written policies require Plaintiffs to report for duty with both their PPE and tech bag in "good working order," (Booth Dep. 254:16-255:18; *see also* Defs.' 56.1 Stmt. ¶ 59 ("EMTs and Paramedics are required to be in uniform with their personal equipment, including their PPE and tech bag, at the start time of their tour ready for

duty.").)  The testimony of Defendants' 30(b)(6) representative and Plaintiffs' non-party supervisors support Plaintiffs' argument that they could not possibly comply with this requirement without checking their PPE and tech bag before the beginning of each shift.  (*See* Booth Dep. 161:4-11, 113:13-17; Ortiz Dep. 34:16-22; Gonzalez Dep. 147:2-5.)

Although the EMS Operations Guide does not include a written requirement that EMTs/Paramedics perform post-shift work, the testimony of Defendants' Rule 30(b)(6) representative, the non-party supervisors of EMTs/Paramedics, and the testimony of the Phase I Plaintiffs is sufficient to establish the basis for a persuasive showing that Defendants' unwritten policies and practices require EMTs/Paramedics to work after their shift has ended, that Defendants are aware that this work is routinely performed, and that they do not routinely provide—and may not even permit—overtime compensation for that work.  (*See* Booth Dep. 152:5-25, 237:13-22, 240:2–5, 246:9-22; Gonzalez Dep. 19:14–20:15; Defs.' Counter 56.1 Stmt. ¶¶ 76, 81; 12/7/16 Faulman Decl. Ex. A.)  In fact, Defendants conceded that when Paramedics participate in narcotics exchanges—a task done post-shift—they do not automatically provide overtime for the narcotics exchange.  (*See* Defs.' Counter 56.1 Stmt. ¶ 81.)

Defendants contend that Plaintiffs fail to "identify a common factual employment setting" for the EMTs/Paramedics because they "worked in different locations, worked different schedules, were supervised by different officers and performed their job duties in different sequences and manners."  (Defs.' Opp. 18.)  They claim that a determination of Defendants' liability must involve an individualized inquiry into whether each Plaintiff did pre- or post-shift work without compensation, and whether Defendants had knowledge of such work.  Finally, they claim that this "'employer knowledge' component involves an individual analysis of employee reporting of such time."  (*Id.*)

These arguments are unavailing.  Under § 216(b), Plaintiffs "need show only that their positions are similar, not identical," *Ayers v. SHS Control Servs., Inc.*, No. 03 Civ. 9077 RMB, 2007 WL 646326, at *4 (S.D.N.Y. Feb. 27, 2007), and courts have often "found opt-in plaintiffs similarly situated in large off-the-clock cases despite the individualized issues such cases present." *McGlone*, 49 F. Supp. 3d at 367 (internal quotation marks omitted) (citing *Barry v. S.E.B. Serv. of New York, Inc.*, No. 11-CV-5089 (SLT)(JMA), 2013 WL 6150718, at *6 (E.D.N.Y. Nov. 22, 2013)).  Further, the individualized inquiry into the employer's knowledge of each individual EMT/Paramedic's pre- and post-shift work will only be required if Plaintiffs fail to establish at trial that Defendants had a policy or practice requiring such work, *see Zivali*, 784 F. Supp. 2d at 468 ("In the absence of a company-wide policy or practice, plaintiffs will have to demonstrate that each individual manager had actual or constructive knowledge that plaintiffs were performing off-the-clock work without proper compensation."); *see also Alonso*, 2011 WL 4389636, at *3 ("[I]ndividual differences in the number of hours worked or diligence in the use of the timekeeping system will not warrant decertification, as long as Plaintiffs show they are subject to a single decision, policy, or plan." (internal quotation marks omitted)), or that CityTime accurately recorded all compensable pre- and post-shift work.  As discussed above, Plaintiffs have made a persuasive showing that, pursuant to Defendants' policies and practices, EMTs/Paramedics performed pre- and post-shift work, and that Defendants failed to compensate them for those hours worked, which were in excess of 40 per week, in violation of Section 207 of the FLSA.  29 U.S.C. § 207(a)(1); *see Torres v. Gristede's Operating Corp.*, No. 04 Civ. 3316(PAC), 2006 WL 2819730, at *11 (S.D.N.Y. Sept. 29, 2006) (granting motion for FLSA collective action where claims required an inquiry "based on policy, practice, and conduct").

Defendants argue that even though several Plaintiffs testified that they did not request

overtime for pre- and post-shift work, such as preparing their PPE/tech bag or returning equipment, other Plaintiffs did request and receive overtime for such activities, (Defs.' Opp. 22–23).  However, Defendants do not identify a single Plaintiff who requested and/or received overtime for pre-shift work.  Moreover, although the evidence adduced by Defendants may suggest that some Plaintiffs occasionally received overtime compensation for post-shift work under certain circumstances (i.e. the work took at least eight minutes), it does not rebut the persuasive showing made by Plaintiffs that EMTs/Paramedics are required to do post-shift work after the end of every shift, that Defendants are aware of this work, and that all of them performed some amount of pre- and post-shift work for which they were not compensated.

Accordingly, this factor weighs in favor of a finding that the EMTs/Paramedics are similarly situated.

## 2.  Defenses Available to Defendants

Defendants argue that their defenses are individualized because the evidence is "completely disparate regarding Defendants' alleged knowledge of Plaintiffs' purported uncompensated work hours." (Defs.' Opp. 25.)  In support of this argument, Defendants point to testimony that suggests that differences among the stations, such as layout and Lieutenant practices, affect whether each EMT/Paramedic's supervisor had actual knowledge of the pre- and post-shift work.  (*Id.*)  As discussed above, Plaintiffs need only prove each supervisor's knowledge of the uncompensated work if they fail to prove at trial that they were subject to a policy and or practice that required the pre- and post-shift work for which they were not compensated, or if they fail to prove that CityTime accurately records compensable pre- and post-shift work.  Here, the "standard of proof and required evidence under FLSA is not an individualized inquiry but one based on policy, practice, and conduct." *Torres*, 2006 WL

2819730, at *11 (internal quotation marks omitted). If the individual defenses become relevant, I may bifurcate trial or draft jury instructions suitable to incorporate them. *See id.* at *11 n.10 ("Even if defendants were to raise highly individualized defenses, the Court may grant collective action and bifurcate trial, as necessary, to address those defenses." (internal quotation marks omitted) (citing *Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1106 (10th Cir. 2001)). Accordingly, this factor also weighs in favor of a finding that EMTs/Paramedics are similarly situated.

### 3. Fairness and Procedural Considerations

Finally, district courts generally review fairness and procedural considerations when determining whether to allow Plaintiffs to proceed using representative testimony. *McGlone*, 49 F. Supp. 3d at 367. When reviewing this factor, "courts consider whether a collective action would lower costs to the plaintiffs through the pooling of resources, efficiently resolve common issues of law and fact, and coherently manage the class in a manner that will not prejudice any party." *Ayers*, 2007 WL 646326, at *6. Almost all of the 2,576 Plaintiffs in this case are EMTs/Paramedics; the cost of a collective action would surely be lower than the combined cost of individual trials since such trials would no doubt result in duplication of factual and expert testimony. Further, permitting the EMTs/Paramedics to proceed in a collective action will allow this court to efficiently resolve the common questions of whether Defendants' policies or practices require EMTs/Paramedics to perform pre- and post-shift work, whether CityTime accurately records pre- and post-shift work, and, if so, whether Defendants systematically fail to compensate EMTs/Paramedics for that work. Permitting the resolution of these questions in a collective action will not prejudice Defendants in any way. Here, "[b]ecause common questions predominate and individual issues may be resolved separately," I find that the "policy objectives

17

of reducing cost and increasing efficiency are best furthered by granting collective action." *Id.* (internal quotation marks omitted).

### 4. EMTs/Paramedics Are Similarly Situated

As discussed above and to summarize, Plaintiffs allege that EMTs/Paramedics are similarly situated with regard to three FLSA claims against Defendants. For the first claim, I find that EMTs/Paramedics are similarly situated with regard to at least two of the three arguments presented. First, I find that Plaintiffs have made a persuasive showing that Defendants have a policy or practice requiring EMTs/Paramedics to conduct pre- and post-shift work, and that they are not compensated for all of this work. *See Torres*, 2006 WL 2819730, at *11. Second, I find that Plaintiffs have made a persuasive showing that CityTime accurately captures pre- and post-shift work, demonstrating that Defendants had knowledge of the EMTs/Paramedics' work but did not compensate them for it. To be clear, these are not findings of fact; however, these sorts of assertions are exactly the type of claims that are appropriately resolved through representative litigation. If Defendants had a policy or practice requiring EMTs/Paramedics to perform pre- and post-shift work without compensation, that policy would apply similarly to all EMTs/Paramedics. Defendants' arguments that they do not have such a policy would similarly apply to all EMTs/Paramedics. The same analysis applies to Plaintiffs' claim regarding CityTime. The parties' dispute as to whether CityTime accurately records compensable pre- and post-shift work is appropriately resolved through representative testimony. Given the similarities of EMTs/Paramedics with regard to Plaintiffs' first claim, and Defendants' concession that EMTs/Paramedics are similarly situated regarding Plaintiffs' second and third claims, I find that any "differences among the plaintiffs do not outweigh the similarities in the practices to which they claim to have been subjected." *Ayers*, 2007 WL 646326, at *5.

### B. *Fire Inspectors*

#### 1. Factual and Employment Settings

There are some notable differences among the Fire Inspectors who testified during Phase I discovery. Although Fire Inspectors have the same basic job duty—"conducting field inspections," (Defs.' 56.1 Stmt. ¶ 110)—they record their time in different ways. Fire Inspectors in the CDA Unit call their supervisors to let them know that they are beginning work, but they only enter their hours into CityTime once per week. (Cendagorta Dep. 60:23-61:11.) Fire Inspectors who report to District Offices, on the other hand, sign into CityTime every morning, at which time they also enter the time they finished work the night before. (Tripodi-Azer Dep. 58:14-24.)

Contrary to EMTs/Paramedics, Plaintiffs do not allege that Defendants have a written policy requiring Fire Inspectors to do any pre- or post-shift work. (Pls.' Mem. 24.) Instead, Plaintiffs rely on the testimony of the four Fire Inspectors who were deposed during Phase I discovery to establish that Fire Inspectors regularly perform uncompensated work outside of their regular shifts, which is recorded by CityTime as a matter of policy. (Pls.' Mem. 24–25.) As with the EMTs/Paramedics, Defendants dispute whether CityTime accurately records this work. (Defs.' Opp. 11.)

#### 2. Defenses Available to Defendants

Defendants argue that the deposition testimony of the four representative Fire Inspectors demonstrates that the overtime claims brought by Fire Inspectors will be highly individualized, and therefore subject to individualized defenses. (Defs.' Opp. 27–29.) However, as with EMTs/Paramedics, this argument ignores the persuasive showing that Plaintiffs have made that Fire Inspectors are similarly situated in their claim that CityTime accurately records

uncompensated overtime.

### 3. Fairness and Procedural Considerations

For the same reasons I found that fairness and procedural considerations support a finding that a representational litigation is appropriate for the EMTs/Paramedics, I find that representational litigation for the Fire Inspectors is appropriate. For the Fire Inspectors, a collective action would also "lower costs to the plaintiffs through the pooling of resources, efficiently resolve common issues of law and fact, and coherently manage the class in a manner that will not prejudice any party." *Ayers*, 2007 WL 646326, at *6 (internal quotation marks omitted). Permitting the EMTs/Paramedics to proceed in a collective action will allow me to efficiently resolve the common question of whether CityTime accurately records the Fire Inspectors' work outside of their regularly scheduled shifts, and whether Defendants systematically fail to compensate them for that work. Permitting the resolution of this question through representative testimony will not prejudice Defendants.

### 4. Fire Inspectors Are Similarly Situated

Although Plaintiffs have not made a persuasive showing that Defendants have a policy or practice requiring Fire Inspectors to perform work outside of their regularly scheduled hours, they have made such a showing that CityTime accurately captures this work and that Defendants have a policy or practice of not compensating Fire Inspectors for that time, demonstrating that Defendants had knowledge of the uncompensated work. Again, I do not and need not find that Plaintiffs have proven this claim in order to permit them to proceed to trial with representative testimony. If Plaintiffs fail to prove this claim at trial, Defendants may, at that point, raise individualized defenses with regard to each of the Fire Inspector Plaintiffs. *Torres*, 2006 WL 2819730, at *11 n.10.

## V.     <u>Conclusion</u>

For the foregoing reasons, Plaintiffs' motion for a finding that they are similarly situated under the FLSA, (Doc. 180), is GRANTED. A status conference to discuss the status of discovery and any other issues shall be held on April 25, 2019 at 12:30 p.m. in Courtroom 518 of the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York. The Clerk of Court is respectfully directed to terminate the open motion at Document 180.

     SO ORDERED.

Dated: March 13, 2019
      New York, New York

Vernon S. Broderick
United States District Judge