

**THE CITY OF NEW YORK**
**LAW DEPARTMENT**
100 CHURCH STREET
NEW YORK, NY 10007

**GEORGIA M. PESTANA**
*Acting Corporation Counsel*

**Andrea O'Connor**
Labor & Employment Law Division
Phone: 212-356-4015
Fax: 212-356-1148
aoconnor@law.nyc.gov

October 20, 2019

**VIA EMAIL**
Honorable Vernon S. Broderick
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

Re:   Perry, et al. v. City of New York, et al.
      13 Civ. 1015 (VSB)

Dear Judge Broderick:

I am an Assistant Corporation Counsel in the office of Georgia M. Pestana, Acting Corporation Counsel of the City of New York, assigned as counsel for defendants in the above referenced action. As discussed at trial, defendants respectfully submit this letter motion seeking to strike the vast majority of the trial testimony of plaintiffs' expert, Dr. Louis Lanier, under Federal Rule of Evidence 702. For the reasons set forth below, Dr. Lanier's trial testimony, with the exception of his testimony on pages 1277:20-25 through 1278:1-16, must be stricken because it is irrelevant and unreliable.

A.   **Standard for Admissibility of Expert Evidence**

Rule 702 of the Federal Rules of Evidence, which governs the admissibility of expert and other scientific or technical expert testimony, provides as follows:

> scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable

> principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court made clear the district court has a "gatekeeping" function under Rule 702.  In other words, it is charged with "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."  *Id.* at 597; *accord Amorgianos v. Amtrak*, 303 F.3d 256, 265 (2d Cir. N.Y. 2002).

In *Amorgianos*, the Second Circuit interpreted the Supreme Court's holding in *Daubert*, and explained that:

> In fulfilling this gatekeeping role, the trial court should look to the standards of Rule 401 in analyzing whether proffered expert testimony is relevant, i.e., whether it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Next, the district court must determine whether the proffered testimony has a sufficiently reliable foundation to permit it to be considered.  In this inquiry, the district court should consider the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony is the product of reliable principles and methods; and (3) that the witness has applied the principles and methods reliably to the facts of the case.  In short, the district court must make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.

303 F.3d at 265-66 (internal citations and quotations omitted).

## B.    Dr. Lanier's Testimony Must be Stricken

### 1.  Dr. Lanier's Testimony is Irrelevant

As stated in *Amorgianos*, a trial court must first look to the standards of Rule 401 to determine whether the expert testimony has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable."  *Id*. Dr. Lanier's testimony fails to meet this threshold.  The central issue that is "of consequence" in this trial is whether plaintiffs were working during the time captured as "noncompensable."  Dr.

2

Lanier's testimony does not assist the jury in making a factual determination on this critical issue because his testimony presupposes that plaintiffs were actually performing compensable work during this time. *See* Trial Tr. at 1292 annexed hereto as Appendix A ("Q: So it's implicit in their [*i.e.* plaintiffs' counsel's] instruction that you should assume that the time captured by the noncompensable field was time worked, right? A. Yes, correct.").

Rule 702 requires the District Court to decide whether the expert's testimony as to a particular matter will "assist the trier of fact." Fed. R. Evid. 702. Expert testimony that "usurp[s] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it," does not "aid the jury in making a decision." *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991). Instead, it "undertakes to tell the jury what result to reach" and thus "attempts to substitute the expert's judgment for the jury's." *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994).

Here, Dr. Lanier's testimony tells the Court and the jury exactly what legal and factual result to reach: that plaintiffs were performing compensable work during 15 minutes of pre- and post-shift time recorded as noncompensable.[1] Dr. Lanier has no knowledge as to what, if anything, plaintiffs are doing the time recorded as noncompensable. Despite that admission, his testimony assumes that plaintiffs started performing compensable work at the moment he began calculating damages for each plaintiff. This assumption usurps the role of the Court and the jury. For example, it is squarely within the Court's province to determine whether a task, such as greeting a Lieutenant upon arrival, is *de minimis* and therefore does not trigger the continuous work day. Dr. Lanier's testimony assumes this to be the Court's finding. Similarly, the question of whether plaintiffs were actually working during the time period for which he calculated damages is the exact issue the jury must decide at trial. Again, Dr. Lanier's calculations assume the jury has already found this.

The Second Circuit holds that while "an expert may opine on an issue of fact within the jury's province, he may not give testimony stating ultimate legal conclusions based on those facts." *Bilzerian*, 926 F.2d at 1294. At the core of Dr. Lanier's testimony is the legal *and* factual conclusion that plaintiffs were actually performing compensable work under the FLSA during the time recorded as noncompensable. For this reason, with the exception of the testimony identified below, Dr. Lanier's testimony must be stricken.

The only portion of Dr. Lanier's testimony that would assist the jury in reaching a determination in this case is the number of weeks Dr. Lanier calculated the plaintiffs to have worked more than 40 hours, exclusive of any noncompensable minutes, and Dr. Lanier's calculation as to plaintiffs' overtime rate of pay. *See* Appendix A, Trial Tr. at pages 1277:20-25 to 1278:1-16. Assuming the Court and the jury find that Dr. Lanier's calculations of these two numbers are reliable, the jury could utilize these two numbers to calculate the damages questions on the verdict sheet issued by the Court on October 18, 2019.

---

[1] Defendants note that Dr. Lanier capped the noncompensable time at 15 minutes pre-shift and 15 minutes post-shift.

2.        **Dr. Lanier's Testimony is Unreliable**

Even if Dr. Lanier's testimony met the threshold relevancy requirement, Dr. Lanier's testimony – with the exception of pages 1277:20-25 to 1278:1-16 – must also be stricken for the independent reason that it is unreliable. Dr. Lanier testified that he "implicitly" assumed that all time captured (up to 30 minutes/day) as noncompensable was time spent engaged in compensable work under the FLSA. This assumption came from plaintiffs' counsel. *See* Trial Tr. at 1291-1292. Dr. Lanier testified that he has no knowledge as to how plaintiffs' counsel arrived at this assumption. *Id.* at 1292-1294.

To be sure, Dr. Lanier testified that he has no knowledge as to what information, if any, plaintiffs' counsel considered in arriving at their assumption that the time captured as noncompensable was time actually worked by plaintiffs. Dr. Lanier does not know if plaintiffs' counsel conducted any studies or audits; he does not know if they reviewed plaintiff's CityTime or payroll data; he does not know if they visited an EMS station; he does not know if a time and motion study was conducted; he does not know if deposition transcripts were reviewed or if plaintiffs' themselves were interviewed. *See* Trial Tr. at 1292-1293. Plaintiffs rested their case without having answered any of these questions. Therefore, the jury can only speculate as to how the assumption upon which Dr. Lanier's entire testimony is based was arrived at.

Plaintiffs' counsel have repeatedly represented to the Court that they did not provide Dr. Lanier with an assumption but rather "instructed" him on to how to calculate damages. This contention, however, is not supported by Dr. Lanier's testimony. Dr. Lanier testified that "implicit" in counsel's instruction was the assumption that plaintiffs were performing compensable work under the FLSA in the time captured as noncompensable and that this assumption came from counsel. *Id.* at 1291-1292. As such, Dr. Lanier's testimony confirms that he was implementing an assumption made by counsel. As noted above, Dr. Lanier has no knowledge as to how counsel arrived at this assumption.

When evaluating the reliability of expert testimony, "it is critical that an expert's analysis be reliable at every step." *Amorgianos*, 303 F.3d at 267. "[A]ny step that renders the analysis unreliable . . . renders the expert's testimony inadmissible." *Id.* Here, Dr. Lanier's first step is unreliable: he does not know how the assumption that plaintiffs were performing compensable work during the time captured as noncompensable was arrived at. In the absence of explanatory testimony on this issue from Dr. Lanier or another witness, the jury cannot possibly understand how Dr. Lanier reached his damage calculations "without representations by counsel or speculation, either of which would be improper." *United States v. Gupta*, 747 F.3d 111, 138 (2d Cir. 2014). Given this missing "step," Dr. Lanier's testimony is unreliable and therefore inadmissible.

However, even if the Court accepts counsel's representation that they provided Dr. Lanier with an "instruction" and not an "assumption," instruction from counsel is not a substitute for expert testimony based on reliable testing, analysis and methodology. *See Nook v. Long Island R. Co.*, 190 F.Supp.2d 639, 642 (S.D.N.Y. 2002) (excluding expert testimony where there existed "[n]o data, testing methodology or empirical evidence [was] offered to support [the expert's] conclusions). Here, Dr. Lanier performed no testing and/or analysis. As such, an

4

unsupported "instruction" that is not tested by the expert himself renders the expert's testimony unreliable and therefore inadmissible.

In justifying the "instruction" provided to Dr. Lanier by counsel, plaintiffs' counsel represented to the Court at the final pre-trial conference on October 4, 2019, that they would "prove" through the testimony of the plaintiffs that plaintiffs were, in fact, working during the time captured as noncompensable.[2] Thus, plaintiffs' counsel proffered that the "instruction" provided to Dr. Lanier would be proven true via plaintiffs' testimony. However, as readily apparent from evidence received at trial thus far, plaintiffs have not "proved" that the *all* the time recorded as noncompensable up to 15 minutes pre- and 15 minutes post-shift is indisputably time worked. Thus, setting aside the fact that Dr. Lanier himself did not test this instruction, the instruction is nevertheless not supported by the evidence adduced at trial.

The trial record is devoid of evidence of how long each plaintiff spends engaged in the pre- and post-shift activities at issue. Using pre-shift as an example, there is no evidence as to the amount of time it allegedly takes a plaintiff to check their PPE each day (if it is checked at all) or to greet the Lieutenant (if at all). Plaintiffs' counsel failed to elicit *any* testimony from *any* plaintiff as to the amount of time they allegedly spent engaged in these activities. The only testimony plaintiffs' counsel elicited was the time plaintiffs "aim" to arrive at their respective station. Even this testimony was called in to question on cross-examination and via the

---

[2] On October 4, 2019, the parties appeared for a final pre-trial conference at which the parties' respective motions *in limine* were argued. In connection with plaintiffs' motion, plaintiffs' counsel stated the following regarding Dr. Lanier's expert report and anticipated trial testimony:

> Dr. Lanier's report and his testimony will explain to the jury that he was instructed by plaintiff's counsel to look at the uncompensated minutes and assign damages, figure out the value of the claim for up to 15 minutes before the shift and up to 15 minutes after a shift. He is making no assumptions about whether or not that time was worked. He is simply saying this is the amount of that claim up to 15 minutes per day. It is what is recorded in CityTime and he is simply putting a value to that and we will prove to the jury, through our testimony of the plaintiffs, that up to 15 minutes per day recorded on the clock and CityTime at beginning of the shift, and up to 15 minutes per day, the recorded on CityTime at the end of the shift we will proof [*sic*] that through our plaintiffs.

*See* Trial Tr. at pages 28-29 annexed hereto as Appendix B.

5

timesheets admitted in to evidence. Similarly, with respect to post-shift activities, there has been no testimony regarding the amount of time each plaintiff spends allegedly "exchanging information" and/or "exchanging equipment" with the incoming unit. While plaintiffs have testified that they may engage in these activities, there has been no attempt by plaintiffs to quantify the time spent engaged in such alleged activities. Again, there has been no attempt by counsel to elicit testimony regarding the time spent engaged in these activities.

Without such evidence, Dr. Lanier's calculations are inherently unreliable because they are based on nothing more than the conclusory statements of counsel that plaintiffs work 15 minutes before their shift and 15 minutes after their shift. *Supply & Bldg. Co. v. Estee Lauder Int'l, Inc.*, 2001 U.S. Dist. LEXIS 20737 at *4 (S.D.N.Y. Dec. 14, 2001)(expert's assumptions "based on conclusory statements of the expert's client, rather than on the expert's independent evaluation are not reasonable."). It is clear that Dr. Lanier's assumption, and therefore his testimony, is based on plaintiffs' counsel's assessment of their case and ***not*** on any independent evaluation conducted by him or on the evidence adduced at trial. As such, Dr. Lanier's damage calculations lack a proper evidentiary basis and are therefore unreliable.

Given the above, defendants respectfully move to strike Dr. Lanier's testimony, with the exception of his testimony at pages 1277:20-25 to 1278:1-16.

Respectfully Submitted,
/s/
Andrea O'Connor
Assistant Corporation Counsel

cc:    McGillivary Steele Elkin LLP (by Email and ECF)
       Attorneys for Plaintiffs

6

# APPENDIX A

A F T E R N O O N   S E S S I O N

2:00 p.m.

THE COURT:  You may be seated.

Ladies and gentlemen, just to reminder tomorrow we will be going from 9:30 to 2:00.  We'll have two breaks in there, but there won't be a lunch break.

Plaintiffs' next witness.

MS. NOBILE:  The plaintiffs call Dr. Louis Lanier.

THE COURT:  Please remain standing while my deputy clerk swears you in.

 LOUIS LANIER,

    called as a witness by the Plaintiffs,

    having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. NOBILE:

Q.  Can you please stay and spell your name for the record?

A.  Louis Raymond Lanier.  L-o-u-i-s, R-a-y-m-o-d, L-a-n-i-e-r.

Q.  Can you please provide the jury with your educational background?

A.  I have a Ph.D in applied economics from Clemson University and I have a BS in economics from Clemson.

Q.  Can you tell the jury your work experience?

A.  While I was at Clemson, I started working for the Public Policy Institute there.  I continued thereafter finishing my dissertation.  Then in 2003 I took a job with Nathan

Associates, which is a consulting firm in Arlington, Virginia.

In 2007 I started with Icon One, which is another consulting firm. In June of 2014 I have been self-employed.

Q. And do you have experience working with large datasets?

A. Yes.

Q. Can you please describe your experience?

A. Sure. I started working with big datasets as an undergraduate. The first large dataset was a -- the State of South Carolina asked me to take all the 1040s filed over your years. That was a big dataset. At the Policy Institute, we had all the standardized test scores from all of the schools, all the grades in South Carolina over the years.

When I got to Nathan, I was looking at pricing datasets that had prices -- daily prices for thousands of goods for some number of years, census data. And then since about 2006 or so I almost exclusively have been looking at big payroll datasets. Those things relate to the labor case.

Q. What tools do you use to work with those datasets?

A. I use statistical software, database management software. The primary program that I use is called Stata.

Q. And I believe you mentiond some work involving datasets related to labor lawsuits.

Can you explain that a little bit more?

A. Yes. Usually with the labor lawsuits -- and I have been doing labor almost exclusively since 2006 or so -- you'll have

payroll data.  You'll have some kind of data that indicates work hours or punch times or something like that.  You may have application data or sales data for sales forces.  Those types of things.

Q.   What do you typically do in those cases with these datasets?

A.   Well, you have to take them and process them, put them together, create variables so that you can do whatever analysis that you been asked to do.  Some of the analyses look to see if there are pay gaps or promotion dates.  You evaluate damages such as wage and hour cases.

Q.   Again, what tools are you using to conduct these analyses?

A.   Again, these days I use Stata almost exclusively.  I used Sas in the past, which is very similar.

Q.   Are those both computer programs?

A.   Yes.

Q.   And how do you find out what legal theories to use when analyzing the data to prepare damages calculations?

        MS. O'CONNOR:  Objection.

A.   I --

        THE COURT:  Hold on two seconds.

        I will allow it.  Objection overruled.

A.   I would get those from counsel.  My clients.

Q.   Have you been certified as an expert in any cases where you calculated damages?

A.   Yes.

Q.   And can you give the jury an example?

A.   Yes.   The Abbey v. The United States case.   It was a case involving I think over 5,000 plaintiffs who were employees of the FAA and there were some unpaid overtime claims there, and I calculated damages for that case.

Q.   Did you use Stata in that case as well?

A.   I used Sas and Stata in that case.

Q.   And in how many cases have you testified in court as an regarding damages calculations?

A.   Not including this, 14.

Q.   And can you tell us a little bit about those cases.

A.   The first one was a case involving voting law in Arizona. I did an analysis of registered voters and voter rolls.   That kind of thing.   The second case was Valez v. Navarrus.   It was a gender discrimination case, and I estimated and valued the pay and promotions and various other things.   Then there was Collin v. D.C Metropolitan Police Department, which was a race discrimination case where I had to analyze how the work hours changed for a minority group of individuals who had their status changed, and I estimated damages based on the changes and the work hours.

Q.   All those cases involve using employer datasets to conduct your calculations -- or let me rephrase that.

          Did Navarrus and the District of Columbia case involve

using employer datasets?

A.   Yes.

Q.   How many times have you testified in depositions about data analysis and damages calculations in employment litigation would you estimate?

A.   Probably around 75.

Q.   Can you describe the largest datasets that you worked with in preparing damages calculations in employment litigation?

A.   I don't know exactly which are the largest.  I know recently just last year I was working in a case where there were hundreds of thousands of employees.  There were 75 class members.  We had data for over 12 years of all types.  That was certainly a very large data intensive case.

Q.   Did you prepare damages calculations based on that dataset?

A.   Yes.

        MS. NOBILE:  Your Honor, at this time I would move to certify Dr. Lanier as an expert in performing back pay using large datasets.

        THE COURT:  Any objection?

        MS. O'CONNOR:  Not at this time.

        THE COURT:  You may proceed.

        MS. NOBILE:  Thank you, your Honor.

BY MS. NOBILE:

Q.   Now, you have been retained by the plaintiffs in this case; is that correct?

A.   That's correct.

Q.   And is your payment in this case contingent on the plaintiffs' being successful?

A.   No.

Q.   How much are you being paid by the plaintiffs in this case?

A.   $295 an hour.

Q.   And what have you been asked generally to do in this case?

A.   To take the data provided by the City, the punch data, and perform back pay calculations specifically with regard to uncompensated preshift and uncompensated postshift minutes as reported in the CityTime data.

Q.   How did you determine who the plaintiffs are in this case?

A.   I was given a list by plaintiffs' counsel.

Q.   And how did you determine the plaintiffs' damages eligibility periods?

A.   On that same list were dates regarding when their damage period should be.

Q.   How did you determine which employee titles to include as part of your calculations?

A.   I got that information from plaintiffs' counsel.

Q.   Which titles were included?

A.   The EMTs and paramedics below lieutenant grade.

Q.   How many plaintiffs are there in this case?

A.   2,598.

Q.   And what datasets have you used in this case to prepare

your damages calculations?

A.   The CityTime data and the FISA data.

Q.   What is FISA data?  What does that contain?

A.   It's the payroll data as I understand it.  It usually comes in four or five different files.  One of those files is a payee task file, which covers types of pay, how much pay, when it was paid and what was earned.  Another file is the accrual file that shows the accrual of various types of annual leave, how much leave that was accrued and by plaintiff of course.  There is a leave usage file.  It shows the use of leave in the same way.  Then there is an employee attributes file, which has what I would call personnel parameters like title code or location and status and things like that.

Q.   Where did you obtain the FISA data?

A.   I got it from plaintiffs' counsel.

Q.   What is your understanding of who provided that data to plaintiffs' counsel?

          MS. O'CONNOR:  Objection.

A.   The City --

          THE COURT:  Sustained.  The answer will be stricken.

Q.   Do you have any knowledge where plaintiffs' counsel obtained that data?

          MS. O'CONNOR:  Objection.

          THE COURT:  I will allow it and then we'll see where it goes.

Do you have any personal knowledge?

THE WITNESS:  I only have an understanding based on what they told me.

THE COURT:  What someone told you.

Objection sustained.

Q.  Is it your understanding that the FISA data is maintained by the City of New York?

A.  That's my understanding, yes.

Q.  You also mentioned CityTime data.  What is understanding of what CityTime data is?

A.  It is a tracking of punch times.  It has employees identified by their employee numbers and punch dates.  So each row in the dataset is a plaintiff day and has a punch-in time and punch-out times and their schedule shifts and it also has classification of some work time and approved overtime, disapproved overtime or noncompensable or uncompensated time.

Q.  And what CityTime fields are portions were you asked to use to prepare your damages calculations in this case?

MS. O'CONNOR:  Objection.

THE COURT:  Sustained.  In connection with the CityTime data, who did you receive that from?

THE WITNESS:  I received it from plaintiffs' counsel.

THE COURT:  Were you directed to look at certain aspects or certain portions of that data?

THE WITNESS:  Yes.

THE COURT:  What portion?

THE WITNESS:  Specifically at the uncompensated preshift and uncompensated postshift fields.

THE COURT:  Go ahead.

BY MS. NOBILE:

Q.  And were you given any parameters for looking at those fields?

A.  I was.  I was asked to cap them at 15 minutes per day each of the fields.

Q.  Is that the preshift and postshift fields; is that right?

A.  Yes.  Uncompensated preshift and uncompensated postshift fields.

Q.  And based on your observation of the data, does CityTime round the uncompensated pre- and postshift minutes?

A.  Yes.

Q.  Can you explain how?

MS. O'CONNOR:  Objection.

THE COURT:  What --

MS. NOBILE:  I can restate.

Q.  Can you explain your observation?

MS. O'CONNOR:  Objection.

THE COURT:  I will allow it.

What did you see?

THE WITNESS:  My observation is that it rounds to the nearest 15 minutes.

THE COURT: Okay.

Q. And based on your observation, how does CityTime record uncompensated time where a plaintiff clocks in two minutes before their paid start time?

MS. O'CONNOR: Objection.

THE COURT: When you looked at the CityTime data, could you tell that a person had clocked in two minutes before?

THE WITNESS: In some cases, yes.

THE COURT: Okay. And what did you observe in those cases where you could see that?

THE WITNESS: About the preshift minutes?

THE COURT: Correct.

THE WITNESS: That it would round the two minutes to zero.

THE COURT: Go ahead.

BY MS. NOBILE:

Q. And did you observe a plaintiff clock in, for example, 22 minutes before their paid start time?

MS. O'CONNOR: Objection.

THE COURT: I will allow it. Overruled.

Do you recall ever seeing someone clock in 22 minutes.

THE WITNESS: I don't remember off the top of my head if I call that specifically that 22 minutes.

Q. Do you know what happened in the CityTime data if there is a clock in of 22 minutes before a shift in terms of rounding?

MS. O'CONNOR:  Objection.

THE COURT:  If you can rephrase the question.

Q.  Sure.  If you observe a punch time in 22 minutes before the paid start time, how would that be displayed in the uncompensated preshift minutes field?

MS. O'CONNOR:  Objection, speculative.

THE COURT:  Sustained.

Did you observe any time where someone had clocked in from eight minutes before their start of their shift?

THE WITNESS:  I am sure I did, but I have no specific recollection of one of the times when I saw that.

THE COURT:  Did you see data for people for members of the service EMTs and paramedics who -- that ran the -- that scanned in eight minutes or more?

THE WITNESS:  Yes, I did.

THE COURT:  All right.  If it was eight minutes or -- in other words, what would you observe or what did you observe when it was more than eight minutes?

THE WITNESS:  When?

THE COURT:  When they scanned in more than eight minutes prior to the start of their shift.

THE WITNESS:  It would depend on how many more it was than eight minutes.

THE COURT:  Let say between eight and 14.

THE WITNESS:  Eight and 14 would get rounded to 15.

THE COURT:  Go ahead.

BY MS. NOBILE:

Q.  How about between 14 and 22, what would that get rounded to?

A.  That would get rounded to 15.

Q.  And when doing your damages calculations, did you use the rounded uncompensated minutes?

A.  Yes.  With the caveat that they were capped at 15 per day per field.

Q.  So based on the cap that you just described, what would happen in your damages if there was a clock out time 32 minutes after the paid end time?

MS. O'CONNOR:  Objection, speculative.

THE COURT:  I will allow it.

You can answer.

A.  Okay.  In my damage calculations, it would be just 15 minutes of postshift time going into the calculation.

Q.  And what if a plaintiff clocked out seven minutes after their paid end time, how would that be treated in your calculations?

A.  There would be no minutes going into the calculation. Zero.

Q.  What if a plaintiff punched in seven minutes prior to the start of the paid time and also seven minutes of the paid time, how would that be treated in your calculations?

A.   There would be no uncompensated minutes in my calculation for that day.

Q.   Did you perform any analysis of the CityTime data regarding whether the plaintiffs in this case were paid for punching in early prior to their paid shifts?

MS. O'CONNOR:  Objection.

THE COURT:  I will allow it.  Overruled.

Did you perform an analysis?

THE WITNESS:  Yes.

Q.   Can you explain what you did?

A.   Yes.  I was asked to look at instances where plaintiffs punched in up to 15 minutes prior to their shift to the beginning of the shift and to see if there was evidence in the approved overtime fields that they had been paid for those up to 15 minutes of preshift time, and I found that in over 99 percent of the cases there wasn't any approved overtime that would match to the preshift minutes.

Q.   Okay.  So we've talked about the FISA data and we have talked about the CityTime data.

How did you compel this data to prepare your calculations?

A.   Okay.  Well, the CityTime data is reported on a daily level and the pay details, the leave usage and leave accruals files are all at the data level.  And so I would take those and process them to the weekly level because that is the level at

which I did the calculation.  And then take those and merge them and the employee attributes file is not really at a data level.  It has some dates in it for changes and parameters and I would take the employee attributes and just kind of pass them through the datasets so I would know on any given day what the title was for example.  And then I would create once the data are together -- well, before and after the data are together, I create variables that are needed for the calculation.

Q.   And how many lines of data were you analyzing?

A.   There were approximately 20 million lines of data.

Q.   And what general procedure did your back pay calculations follow?

A.   Generally speaking determine how much plaintiff was paid for a given week and then determine how much they should have been paid if they had been paid for that uncompensated time to the extent that it crossed over the 40-hour threshold.

Q.   Did you use pay types as parts of your calculations?

A.   Yes.

Q.   And what pay types are used in your calculations?

A.   There are literally hundreds of pay types and pay details in FISA data.  The -- I can give you some examples of what they get kind of categorized into.  You have got salary, regular pay.  You've got recurring types of pay with differentials like longevity differential.  You have a nonrecurring differential specifically to a particular day, a night shift deferential.

You have overtime pay of course.

Q.   And in your calculations, did you account for change in work schedules as all?

A.   Yes.  Also part of the pay details file, there is some pay types in there that tell you essentially how the schedules are changing from one week to the next so that you can allocate the appropriate pay to the two weeks within the pay period.

Q.   Did you calculate an hourly rate for the plaintiffs to use in the overtime calculations?

A.   Yes.

Q.   And how did you do that?

A.   Well, of course a pay rates is dollars over hours, right. So the dollars in the numerator were all non-overtime paid dollars.  So you get your salary and recurring differentials and non-reoccurring differentials and then the hours in the denominator would be all non-overtime paid hours.

Q.   And what is the denominator for a 32-hour week for a plaintiff?

A.   Assuming that the plaintiffs had no leave without pay that week would be 32.

Q.   What is the significance of leave without pay?

A.   Leave without pay is substracted.  It has no pay associated with it.

Q.   What is the dominator in that 40-hour week?

A.   Again, assuming no leave without pay, it would be 40 hours.

Q. And how many statutory claims periods did you calculate in this case?

A. Two.

Q. And what were they?

A. Two years back from the relevant date and three years back from the relevant date.

Q. And would that be for each plaintiff?

A. Yes.

Q. And what CityTime fields or data did you incorporate into your calculations?

A. The uncompensated preshift minutes and uncompensated postshift minutes.

Q. Were both of those fields under the cap that you described earlier?

A. Yes. Yes, they both are capped at 15 minutes per day.

Q. How would you figure out the back pay owed for a given work week?

A. Well, essentially I would take the total hours worked and add that to the uncompensated minutes to the extent there were any from the CityTime data preshift or uncompensated. And to the extent those work hours plus those uncompensated minutes went over the 40-hour weekly overtime threshold, then whatever was over the threshold would be valued at that pay rate that we spoke about times one and a half.

Q. And once that total is calculated, did you apply any

offsets?

A.   Yes.   If there was any overpaid overtime, then that would be credited against any damage claim.

Q.   When you say credited against, does that mean subtracted from?

A.   Yes.

Q.   What happened in your calculations if the addition of uncompensated pre- and postshift minutes to a plaintiffs' weekly hours worked did not add up to an amount over 40?

          MS. O'CONNOR:   Objection.

          THE COURT:   Objection overruled.   I will allow it.

A.   There would be no damages in that week.

Q.   Did you prepare weekly calculations for each plaintiff?

A.   Yes.

Q.   I am going to show you what has been identified as Plaintiffs' 74 D.  You can look at the binder or it will show up on the screen in front of you.

          Dr. Lanier, are you familiar with this document?

A.   Yes.

Q.   Did you create this document?

A.   Yes.

Q.   And what is this document?

A.   This document is -- is this the dataset that you end up with at the end of the programming calculations that I do for that day and bring data and put it into a PDF file and format

it.

Q.  Let's look at the header.  It is three-year SOL.

What does that signify?

MS. O'CONNOR:  Objection, your Honor, this is not in evidence.

MS. NOBILE:  I was having him authenticate it.  I can move for the admission to be published to the jury, your Honor.

MS. O'CONNOR:  I have an objection.

THE COURT:  Okay.  I will --

MS. O'CONNOR:  Your Honor --

THE COURT:  Hadn't we discussed this?

MS. ELKIN:  Yes.

MS. O'CONNOR:  If we can have a very brief side bar.

THE COURT:  Okay.

(Continued on next page)

(At the sidebar)

MS. NOBILE:  Your Honor, we're seeking to enter this as a demonstrative.

THE COURT:  Yes.

MS. O'CONNOR:  Okay.  I mean, it's -- the jury is going to have it.  Whether it is a demonstrative, this will -- the jury will have it.

THE COURT:  No.  No, not necessarily.  A demonstrative doesn't go back to the jury.  It's there to help them as the doctor testifies; but at least that is my current intention that it would be used for.  It will be used for when they are to follow along with the doctor.

MS. O'CONNOR:  My substantive objection is that -- we're heard about there have been two instructions that he received in creating this dataset.  One is to assume -- to include all time and noncompensable damage calculation and institute a cap.  There has been no testimony about where those came from, how they are arrived at.  I don't know how reliable this dataset is at this point in time.

THE COURT:  I guess the question I have is are you going to introduce disks, hard drives and the like with the data that was provided to the doctor?  In other words, the raw data that was provided to the doctor or not?

MS. NOBILE:  We are going to enter that into evidence, your Honor.  It is millions and millions of lines in a format

that I don't know if a jury would be able to read.  It is computer programming.  It came directly from the City.  It's the City data.  They have access to the same data.  They also have access to the programming Dr. Lanier used to arrive at the output of his calculations.

THE COURT:  When you say that, I don't know how the data was transmitted from defendants to plaintiffs' counsel.  Are you saying there were -- were there hard drives that you just transmitted from -- it was turned over from the defense and you turned it over to the doctors.

MS. NOBILE:  Exactly, I think originally it was CDs and now I think it is through a filing sharing system.  The files as we received them from the City went to Dr. Lanier.

THE COURT:  Do you have those?

MS. NOBILE:  I don't personally, but we certainly still have access to those files and we've shared the files with the programming with the City.

THE COURT:  Okay.  I am going to allow the doctor to testify.  You just need to -- in other words, whatever you provided to the doctor, you need to share that with the defense so that they have knowledge how it was provided.

MS. NOBILE:  Okay.

MS. O'CONNOR:  Your Honor, with respect to the two assumptions that were placed by the doctor, there has been no testimony on the source of those.

THE COURT:  I think he said from counsel I thought.

MS. O'CONNOR:  He did.  We'll leave it for cross.

THE COURT:  Why does it matter?  In other words, why does it matter which attorney provided it.

MS. O'CONNOR:  I don't think it matters which attorney.  He is basing these documents on the assumption that they were working during the uncompensated time such that they can compensated for it and we don't know the source of that and what that is based on.  I mean, an expert's analysis and report has to be reliable at every step and we're missing that step right now.

MS. NOBILE:  Your Honor, in damages calculations in collective actions, it is common for an expert to be given an input from plaintiffs' counsel and instruction from plaintiffs' counsel in terms of what to arrive at to get to that number.

THE COURT:  What I would say is it would have -- you could if you wanted voir dire him.  You could do that.  If you want to do it on cross.

MS. O'CONNOR:  I will save it for cross.

THE COURT:  You can do that.  I am not going to preclude him from testifying to it, but he is subject to cross-examination what he was told and even things he wasn't told about.

MS. O'CONNOR:  Thank you.

MS. NOBILE:  Thank you, your Honor.

(In open court).

THE COURT:  So 74 D will be admitted as an demonstrative.

(Plaintiff's Exhibit 74 D received in evidence)

THE COURT:  What that means, ladies and gentlemen, it is being admitted and you will be able to see it.  It will be projected on your screen, but it is not coming in evidence. This is to help you understand the doctor's testimony about what he did and the work he performed.  It's not coming in as evidence at this time.

BY MS. NOBILE:

Q.  The title at the top of this page is three-year SOL.

What does that mean with respect to this document?

A.  That indicates there are two of these.  It indicates which statutory scenario this represents.  This is a three-year scenario.

Q.  And looking at the titles here on the first page, what is EMPNO?

A.  That is the employee number.  It's an employee ID number.

Q.  What is last and first, what do those signify?

A.  That is the name of the plaintiff, last and first name of the plaintiff.

Q.  How about the title?

A.  That's the code for the job title that they hold.

Q.  How about the work unit?

A.   That is the code for work location information.

Q.   And how about the unpaid minutes claim?

A.   That is the dollar amount calculated they are owed over the time period.

Q.   How about unpaid minutes?

A.   That is the number of minutes over the and time period, the number of uncompensated pre- and postshift minutes and they are capped 15 each per day over the damage period.

Q.   What about weeks?

A.   That is the number of weeks in the calculation for each plaintiff.

Q.   We'll have it flipped to the last page, page 82.

        Before we talk about this, did you extrapolate your calculations at all in this case?

A.   I did.

Q.   And why did you do that?

A.   I was asked to do it by plaintiffs' counsel.

Q.   Was there -- when did the data that you were analyzing end?

A.   On March 2nd, 2019.

Q.   Explain how you extrapolated.

A.   If you look at the exhibit, you can see that there is the first row.  March 2nd, 2019.  So that is the total that is unextrapolated from data.  Then I calculated through September 1st of 2018, which is exactly six months back from March 2nd, and took the difference.  And so the difference

represents the amount of damages over the most recent six

months in the data.  I found out how much that was per

plaintiff per week and it is $5.34.  And in order to

extrapolate that, I multiplied a number of plaintiffs actively

employed as an EMT and paramedic at the end of the day that

number is 1,249 plaintiffs and multiply that by 32 weeks, which

is the time between March 2nd and October 12th and added that

to the data total to the extrapolated total.

Q.   Based on your calculations, how many minutes of

uncompensated time of up to 15 minutes per day preshift and 15

minutes per day postshift are recorded in CityTime for the

plaintiffs for their three-year statutory starting date

extrapolated through October 12th of 2019?

A.   That will be the $30,449,855.

Q.   What was the outcome of your calculations of the back pay

damages for the plaintiffs for up to 15 minutes per day

preshift and up to 15 minutes per day postshift for a

three-year statutory starting date extrapolated through

October 12th, 2019?

A.   That is the $6,231,529.

Q.   And is this outcome one that is based in your experience

and expertise on a reasonable degree of scientific certainty?

          MS. O'CONNOR:  Objection.

          THE COURT:  Sustained.

Q.   Are you confident in the accuracy of your calculations?

A.  Yes.

Q.  Did you perform them using your expertise that you gathered through your work using these types of datasets?

MS. O'CONNOR:  Objection.

THE COURT:  I will allow that.  Overruled.

A.  Yes.

Q.  Okay.  Now, I am going to show you what has been identified as Plaintiffs' 74 E.

What is this document?

A.  This looks like the table for the two-year statutory period.  So it's -- in every way the analogue of the table that we looked at.  It is just for the two-year period instead of the three-year period.

Q.  Let's flip to the last page of the document.

Based on your analysis, how many minutes of uncompensated time of up to 15 minutes per day preshift and up to 15 minutes per day postshift are recorded in CityTime for the plaintiffs for their two-year statutory starting date extrapolated through October 12th, of 2019?

A.  29,61,035.

THE COURT:  Counsel, are you asking for P 74 E to be admitted as a demonstrative?

MS. NOBILE:  Yes, your Honor.

THE COURT:  Here again, ladies and gentlemen, P 74 E is being admitted as a demonstrative.  It is not coming into

evidence. In other words, at this stage when you deliberate, you will not have a copy of it. It is there so you can follow along and listen to the doctor's testimony to aid you in evaluating the doctor's testimony.

Go ahead.

BY MS. NOBILE:

Q. Again, how many minutes of uncompensated time did you see for the two-year period extrapolated through October 12th, 2019?

A. That's the 29,61,035.

Q. And what was the outcome of your damages calculations of the back pay owed for the plaintiffs for up to 15 minutes per day preshift and up to 15 minutes per day postshift for a two-year statutory starting date extrapolated through October 12th, 2019?

A. That's the $5,988,277.

Q. Is that outcome based on the methodology you described earlier for preparing these calculations?

A. Yes.

Q. Based on your analysis of the data, how many work weeks did the plaintiffs work 40 hours or more excluding uncompensated minutes for the three-year statutory period?

A. 357,744 weeks.

Q. Based on your analysis of the data, how many work weeks did the plaintiffs work 40 hours or more excluding uncompensated

minutes for the two-year statutory period?

A.   That's 341,829.

Q.   And based on your analysis of the data, what is the plaintiffs' average regular rate of pay for a three-year statutory period?

A.   That averages $26.84.

Q.   When that is multiplied by time and a half what is the average rate?

A.   $40.26.

Q.   And based on your analysis of the data, what is the plaintiffs' average regulate of pay for a two-year statutory period?

A.   $27.8.

Q.   When that is multiplied by time and a half, what is the average rate?

A.   That comes to $40.62.

        MS. NOBILE:   I will pass the witness, your Honor.

        THE COURT:   Okay.   Cross-examination.

CROSS-EXAMINATION

BY MS. O'CONNOR:

Q.   Good afternoon.

A.   Good afternoon.

Q.   As you noted Dr. Lanier, you have been retained by the plaintiffs in this case as an economic expert; correct?

A.   Yes.   I have been retained to do the calculations that I

did, yes.

Q.   And during the course of this litigation, you drafted four expert reports?

A.   Four or five.

Q.   Four or five?

A.   I think it might be five.

Q.   You were paid to draft all four of those reports?

A.   All five.

Q.   Pardon me.  All five?

A.   Yes.

Q.   You were paid by plaintiffs' counsel firm?

A.   Yes.

Q.   You testified that you are currently self-employed; correct?

A.   I am.

Q.   And you provide both consulting and litigation services?

A.   Yes.

Q.   To clients?

A.   Yes.

Q.   And as of March of 2019 plaintiffs' counsel firm was your only client with respect to litigation services; correct?

A.   As of when?

Q.   March of 2019.

A.   No, that is not correct.

Q.   That's not correct?

A.   No.   That's not correct.

MS. O'CONNOR:  Your Honor, may I approach to refresh?

THE COURT:  You may.

Well, you may but if I could look at what you have.

MS. O'CONNOR:  I have a copy for your Honor.

THE COURT:  All right.

MS. O'CONNOR:  And I have a copy for plaintiffs' counsel.

THE COURT:  The answer was, That's not correct.

MS. O'CONNOR:  I can impeach with it if you would like to mark it.  I am hoping I will not need to mark it as an exhibit.

THE COURT:  The proper way to proceed is to ask:  Were you asked this question and did you give this answer.

MS. O'CONNOR:  Actually, you know what, that's okay.

THE COURT:  Okay.

MS. O'CONNOR:  I will move on.

BY MS. O'CONNOR:

Q.   In drafting the five reports in this case and in preparing your damage calculation, you reviewed you said the plaintiffs' payroll data, FISA data?

A.   Yes.

Q.   And can we call that payroll data?

A.   Sure.

Q.   And that payroll data contained the base salary for the

plaintiffs?

A.  Yes.

Q.  That data also contained the overtime payments paid to the plaintiffs; correct?

A.  Yes.

Q.  And this payroll data indicated that from February of 2009 to March of 2019 the plaintiffs in this case were paid over $152 million in overtime?

MS. NOBILE:  Objection, your Honor.

THE COURT:  I will allow it.  Overruled.

A.  I don't know what that number would be, but the data only goes back to February of 2010.

Q.  Pardon me.  2010.

So from February of 2010 to March of 2019 did the data indicate that the plaintiffs were paid over $152 million in overtime?

A.  I don't know.

Q.  But based on the data that you had, you could determine that; correct?

A.  Yes.

Q.  But you were not asked to look at the overtime paid?

A.  Not in that way, not to sum it up over the time period.

Q.  You could do that; correct?

A.  I could, yes.

Q.  And you also reviewed plaintiffs' CityTime data?

A.  Yes.

Q.  And from this data you could determine how many times a plaintiff requested overtime during the period of data that you had; correct?

MS. NOBILE:  Objection.

THE COURT:  One second.  If you could rephrase the question.

Q.  From this CityTime data you can see how many times a plaintiffs requested overtime; correct?

A.  I am not sure if that is correct or not.

Q.  Let me ask you a different question.  The data you received indicated how many times a plaintiff requested overtime; right?

A.  That's not my understanding.

Q.  Your understanding is that the data you received did not indicate -- did not show any overtime requests made?

A.  That's not my understanding either.

Q.  Did the data that you reviewed show any overtime paid?

A.  Are we referring to CityTime here?

Q.  Any data that you looked at?

A.  Yes.

Q.  So any data that you looked at could you tell how many times each plaintiff requested overtime over the statutory period?

A.  I don't know.  I don't know what it said about requests in the fields that indicated that it showed requests.

Q.  So your testimony is that the data you received from plaintiffs' counsel had no field for overtime requests made?

MS. NOBILE:  Objection.

THE COURT:  I will allow it.  Overruled.

A.  It had no field that was -- that indicated that it was for overtime requests made, yes.

Q.  Was there any field that indicated when overtime was paid?

A.  In CityTime data?

Q.  In any data you looked at.

A.  Yes.

Q.  Okay.  So you could tell how many instances a plaintiff was paid overtime; correct?

A.  Yes.

Q.  And is it your understanding that in order to be paid overtime, a plaintiff had to request the overtime?

MS. NOBILE:  Objection.

THE COURT:  If you know.

A.  I don't know.

Q.  You don't know that.

But you could see from the data that the plaintiffs were paid 1.7 million different times for overtime; right?

MS. NOBILE:  Objection.

THE COURT:  I will allow it.  Overruled.

A.  I could do that calculation.  I don't know that number myself.

Q.   Okay.  But you could do that calculation?

A.   I could.

Q.   You could also see what percentage of those -- withdrawn.

Now, you testified about how you arrived at a rate of pay for a plaintiff in a particular week; correct?

A.   Yes.

Q.   And the plaintiffs in this case have different rates of pay; correct?

A.   Yes.

Q.   You testified that the average rate of pay for a three-year statute of limitations was $26.24?

A.   Yes.

Q.   So if you had applied a rate of pay of $427.25 for a plaintiff, that would be a mistake; right?

A.   It would be, yes.

Q.   So when you applied a pay rate of $427.25 in the week of December 4th, 2016 for the plaintiff Michael Meyer, that would be a mistake; right?

A.   That was at the point of that report, but that mistake has been corrected in most recent reports.

Q.   If you had applied a rate of 98 cents to a particular plaintiff, that would be a mistake; right?

A.   It would be -- in all these cases, it would be a reflection of what the data was showing, the calculation calculates based on the data.  If it showed 98 cents then there was probably

some --

Q.   I am not asking you to speculate.  I am asking that -- let me ask you this --

THE COURT:  Just listen to the precise question and just give the answer that relates to that.  You will have an opportunity if there is redirect examination to get initial questioning.

Q.   Dr. Lanier, what report was that corrected in the 427-dollar rate, what report did you correct that in?

A.   It would be the most recent report.

Q.   Okay.  Now you'd agree in order to be eligible for damages in this case under the FLSA, the plaintiff had to have worked at least 40 hours in a week; correct?

MS. NOBILE:  Objection.

THE COURT:  I will allow it.  If you know.

A.   That was my understanding, yes.

Q.   So if a plaintiff in this case did not actually work 40 hours in a week, they would not be eligible for damages; correct?

A.   That's correct.

Q.   So you would agree with me that if a plaintiff did not actually work 40 hours in a week, they should not receive damages?

A.   Yes.

MS. O'CONNOR:  If we could pull up Defendant's Exhibit

K 4.  This is not yet in evidence.

THE COURT:  Okay.

Q.  Dr. Lanier, I understand that you most likely have not seen this data in this format.  First, let me ask is there any objection to putting in a time sheet for Ms. Bellido for the week ending January 19th, 2019?

MS. NOBILE:  I don't believe this is on the Defendant's Exhibit list, your Honor.

MS. O'CONNOR:  It's not.

MS. NOBILE:  Yes, there is an objection if it was not previously identified.

THE COURT:  It is cross-examination.  I will allow it.

MS. O'CONNOR:  Thank you, your Honor.

Publish to the jury, please.

BY MS. O'CONNOR:

Q.  For this particular week, Dr. Lanier, when you add up where you see that line that says regular hours along the left-hand side down the row?

A.  Yes.

Q.  If you follow that all the way over to the right-hand side where it says "weekly totals," do you see that?

A.  I do.

Q.  That says 32 hours; right?

A.  Yes.

Q.  You would have a field in your data that you examined that

showed the regular hours that an employee worked; correct?

A.   Yes.  I believe there is regular hours field in there.

Q.   You would also have a field that would show approved final overtime, correct, or paid overtime?

A.   I would have some fields that showed paid premium overtime, paid regular time, that sort of thing.

Q.   Here it is six hours of overtime; do you see that under weekly totals?

A.   I see that.

Q.   Here where it says "noncompensable hours," that is the field that you looked at; right?

A.   The noncompensable hours would be divided in four different fields so some of amount.

Q.   This week the weekly total for the noncompensable hours was 45 minutes?

A.   I see that, yes.

Q.   Now, you testified that when you were arriving at your calculations, you would add up the regular hours worked, the overtime and the noncompensable hours capped at 30 minutes a day; correct?

A.   That's the effect of the caps, the 15-minute caps.

Q.   So here utilizing your methodology, Ms. Bellido had a total of 38 hours and 45 minutes; is that correct?

A.   Yes.

Q.   So during this particular week Ms. Bellido would not be

entitled to damages; correct?

A.   According to this sheet, correct.

Q.   But during this particular week your damages did find that Ms. Bellido was entitled to 30 minutes of damages; isn't that true?

A.   I don't know.

Q.   You don't know?

A.   No.  I don't know what every plaintiff has per week.  I would have to see my data.

Q.   And you don't have your data here; right?

A.   No.

Q.   You knew you were coming to testify today; right?

          MS. NOBILE:  Objection.

          THE COURT:  I will allow it.  Overruled.

A.   Yes.

Q.   You could look at your data to determine whether or not you did in fact award Ms. Bellido damages for this day; right?

A.   Yes, I could.

Q.   Assuming that your damage calculation did award her damages in this particular week, that would be a mistake; right?

A.   No.

          (Continued on next page)

Q.   Assuming that you awarded her 30 minutes of damages in a week in which she did not work 40 hours, that would be a mistake, wouldn't it?

MS. NOBILE:  Objection.

THE COURT:  Sustained.

Q.   She would not be eligible for damages unless she worked 40 hours in a week, is that correct?

A.   That's correct.

Q.   And her time sheet indicates that she did not in fact work 40 hours this week?

A.   Her time sheet indicates that, yes.

Q.   The information on the time sheet is the same information that you would have in order to calculate damages, correct?

A.   I would have the time sheet information, but the damages are based on the payroll information.

Q.   I'm only asking you about the hours.  We agree that in order to be eligible for damages under your methodology, the plaintiff had to have worked 40 hours, correct?

A.   Yes.

Q.   Here, assuming that this accurately reflects Ms. Bellido's CityTime data for that week and that if that reflects 38 hours and 45 minutes, she would not be eligible for damages that week, correct?

MS. NOBILE:  Objection.

THE COURT:  Sustained.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Q.  Let me ask you this.  If you calculated damages for a plaintiff in a week in which they did not work 40 hours, that would be a mistake, right?

A.  Yes.

Q.  And, in fact, you calculated damages for plaintiff Jamil Perez for the week ending October 29, 2011, when he did not work 40 hours that week, didn't you?

        MS. NOBILE:  Objection.

        THE COURT:  I'll allow it, if you know.

A.  I don't know.

Q.  You don't know.

        You calculated damages for plaintiff Mykka Richardson during the week of December 14, 2013, when she did not work 40 hours in that week, didn't you?

A.  I don't know.

Q.  You also calculated damages for plaintiff Carlos Avellaneda during the week ending September 29, 2012, when he did not work 40 hours, didn't you?

        MS. NOBILE:  Objection.

        THE COURT:  I'll allow it.

        You can answer.

A.  I've been saying I don't know.  Let me clarify a little further.

        MS. O'CONNOR:  Your Honor --

        THE COURT:  If he needs to clarify his answer, he can

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

do that.

A.  My calculation relies on the hours as they come out of the payroll data.

Q.  Now, you testified that you arrived at the average number of weeks a plaintiff worked over 40 hours, right?

A.  I'm sorry.  Could you say that again.

Q.  Sure.  You testified that you identified the average number of weeks that the plaintiffs worked over 40 hours, correct?

MS. NOBILE:  Objection.

A.  I didn't testify --

Q.  You testified about the total number.  Pardon me.

A.  The total, yes.

Q.  Now, in performing your calculations you only looked at the noncompensable field, right?

A.  From the CityTime data, yes.  The two noncompensable fields pre and postshift.

Q.  And you only looked at that field because that's what plaintiffs' lawyers told you to do, right?

A.  Yes.

Q.  In fact, you were told by them to assume that the noncompensable time was time worked, correct?

A.  I wasn't told that by them, no.

Q.  You were told that implicitly that in order to make your calculations you should assume that that was time worked, weren't you?

MS. NOBILE:  Objection.

THE COURT:  I'll allow it.

A.  I think it's implicit in their instruction.

Q.  So it's implicit in their instruction that you should assume that the time captured by the noncompensable field was time worked, right?

A.  Yes, correct.

Q.  And you have no idea how they arrived at that assumption, do you?

A.  They being?

Q.  Plaintiffs' counsel.

A.  How they arrive at that instruction?

Q.  At that assumption.

A.  That the non-- the uncompensated time fields represented work?

Q.  Yes.

A.  I don't know how they came to that conclusion.

Q.  You don't know what information, if any, plaintiffs' lawyers reviewed to arrive at that assumption, do you?

A.  No.

Q.  You don't know if they engaged in any analysis to arrive at that assumption, do you?

A.  No.  I don't know.

Q.  You don't know if they conducted any studies to arrive at that assumption, do you?

A.   I don't know.

Q.   You don't know if plaintiffs' counsel engaged in any audits to arrive at that assumption, do you?

A.   I don't know.

Q.   You don't know if they looked at the plaintiffs' CityTime data in arriving at that assumption, do you?

A.   No, I don't know.

Q.   You don't know if they looked at plaintiffs' payroll data?

A.   I don't know.  Yes, that's correct.

Q.   You don't know if they ever visited any EMS stations to see if the plaintiffs were actually working during that time, do you?

A.   That's correct.

Q.   And you don't know if plaintiffs' counsel ever conducted a time-and-motion study to determine that was time worked, do you?

A.   That's correct.

Q.   You don't know if they reviewed plaintiffs' deposition transcripts in arriving at that assumption, do you?

A.   I don't know.

Q.   You don't know if they interviewed plaintiffs, do you?

A.   I don't know.

Q.   So you cannot testify at all as to why plaintiffs' counsel arrived at the assumption that the noncompensable time was time worked, can you?

A.   I cannot.

Q.   And you testified that in creating your calculations you did not look at the time that a plaintiff actually clocked in and actually clocked out, correct?

        MS. NOBILE:  Objection.

        THE COURT:  Rephrase the question.

        MS. O'CONNOR:  I can rephrase.

Q.   In arriving at your calculations you did not look at the time the plaintiffs actually clocked in, correct?

A.   That's correct.

Q.   And you did not look at the time they actually clocked out, correct?

A.   That's correct.

Q.   And you testified that this information was available to you?

A.   Yes.

Q.   So in generating your calculations you could have looked at the exact time they clocked in and the exact time they clocked out, but you did not do that, correct?

A.   I did not do that.  My assignment did not call for it.

Q.   And plaintiffs' counsel gave you the assignment to not look at the time in and time out, right?

        MS. NOBILE:  Objection.

        THE COURT:  Sustained.

Q.   Did plaintiffs' counsel tell you to look at the time in and

time out?

MS. NOBILE:  Same objection.

THE COURT:  I'll allow that.

A.  No.

Q.  Now, I understand that you are not an expert in the FLSA, correct?

A.  That's correct.

Q.  But we have reached an agreement that in order to be eligible for damages under the FLSA in the context of this case the plaintiff had to work over 40 hours, correct?

A.  That's correct.

Q.  You also don't know anything about the job duties of EMTs and paramedics, correct?

A.  Not specifically, no.

Q.  But you do know that in each of the plaintiffs in this case, they were assigned to a station, an EMS station?

A.  I'm aware that at least some were.

Q.  And you're aware that in each station there is a CityTime hand scanner?

A.  I'm not aware of the scanners, no.

Q.  And are you aware that when the plaintiffs arrive at their station the first thing they do is hand-scan in?

A.  I am not aware of that, no.

Q.  Well, for the purposes of these questions you can assume that the plaintiffs scan into CityTime when they arrive at

their station, OK?

A.   OK.

Q.   So you would agree with me that a plaintiff could not be working prior to their arrival at a station, right?

        MS. NOBILE:   Objection.  He testified that he didn't have knowledge about the --

        THE COURT:   Sustained.

Q.   You would agree with me that a plaintiff couldn't be working before they arrived at work, right?

        MS. NOBILE:   Objection.

        THE COURT:   Sustained.

Q.   If a plaintiffs' schedule was, their scheduled tour began at 7 a.m. and that a plaintiff arrived at a station at 6:52 a.m., you would agree with me that they wouldn't be working from 6:45 to 6:52, right?

        MS. NOBILE:   Objection, your Honor.

        THE COURT:   Do you have any knowledge concerning the work performed by any of the plaintiffs?

        THE WITNESS:   No.

        THE COURT:   And do you have any knowledge about whether and to the extent there was work performed, when that would have been performed?  When in the course of any particular day, other than you have certain data there.

        THE WITNESS:   I wouldn't know.

        THE COURT:   Go ahead.

Q.  And you obtained all your information from this case from plaintiffs' lawyers, right?

A.  I wouldn't say all the information.

Q.  They provided you with the data you relied on, correct?

A.  Yes.

Q.  And you are not making any assumptions that the plaintiffs were working prior to the time they scanned into CityTime, correct?

MS. NOBILE:  Objection.  Calls for speculation.

THE COURT:  Is that an assumption that you are making? Are you assuming that the plaintiffs were working prior to the time they scanned into CityTime?  Is that an assumption that you believe you are making?

THE WITNESS:  I'm sorry.  Could you say that again.

THE COURT:  Sure.  Is one of the assumptions that you're making in doing the work that you've done, are you assuming that the plaintiffs were working prior to the time they scanned into CityTime?

THE WITNESS:  I am not assuming one way or the other.

Q.  You are not calculating any damages based on times that they were not scanned into CityTime, correct?

A.  That's not correct.

Q.  So you are assuming that they are working outside of what is depicted in CityTime data?

A.  No.

Q.   Let's start over.  Let's use this for an example.  A plaintiffs' tour is starting at 6 a.m.  You are with me?

A.   Yes.

Q.   Let's say the plaintiff scans in at 5:45 a.m.  OK?

A.   OK.

Q.   So 15 minutes before their shift starts.  You are making no assumptions that the plaintiff worked prior to them scanning in, correct?

A.   I am making no assumption either way relative to the scan.

Q.   So you could be making an assumption that they were working prior to scanning into CityTime?

          MS. NOBILE:  Objection, your Honor.

          THE COURT:  I'll allow it.

A.   I calculate my hours worked based on the payroll data, and whether someone is scanned in or not is not part of the calculation.  It's based on the hours that are in the payroll data.  So I can't say that what I see in the payroll data necessarily always matches to what's in the CityTime data.

Q.   So you were advised to ignore the time a plaintiff scanned into CityTime in calculating damages?

A.   No.

Q.   But you didn't consider it at all?

A.   When there were discrepancies between the CityTime data and the payroll data, I defaulted to the payroll data.

Q.   My question, Doctor, is, when you were calculating damages

you did not look at the time a plaintiff scanned in or out,

correct?

A.   That's correct.

Q.   And noncompensable time doesn't reflect time that a

plaintiff was not scanned into CityTime, correct?

          MS. NOBILE:  Objection, your Honor.

          THE COURT:  One second.

          MS. O'CONNOR:  I can ask it a different way.

          THE COURT:  If you could, yes.

Q.   What is your understanding of what noncompensable time

represents?

A.   It's any part of the punch duration, the time between punch

in and punch out that falls outside of the scheduled time that

has not been approved or disapproved as overtime.

Q.   It would be fair to say that in order to record

noncompensable time a plaintiff would have had to scan into

CityTime first?

A.   Yes.

Q.   My question is, you weren't looking at any times prior to a

plaintiff scanning into CityTime, right?  That was not part of

your analysis?

A.   No.

Q.   Now, you also testified that you put certain caps in place,

a 15-minute preshift cap and a 15-minute postshift cap,

correct?

A.   Yes.

Q.   And, again, plaintiffs' lawyers told you to put those caps in place, correct?

A.   That's correct.

Q.   And you did not perform any independent analysis as to whether plaintiffs were actually working 15 minutes before their shift, correct?

MS. NOBILE:  Objection.  Asked and answered.

THE COURT:  I'll allow it.  Overruled.

A.   That's correct.

Q.   And you did not perform any independent analysis as to whether the plaintiffs were actually working for the 15 minutes after their shift, correct?

A.   That's correct.

Q.   You have never spoken to a plaintiff in this case, correct, about the case?

A.   Not about the case, no.

Q.   And you've never read a deposition transcript of the plaintiffs in this case, correct?

A.   That's correct.

Q.   So you have no knowledge as to whether or not the plaintiffs were actually working during the time in which you calculated damages for them, correct?

MS. NOBILE:  Objection.  Asked and answered.

THE COURT:  I'll allow it.  Overruled.

A.   That's correct.

Q.   And you just assumed that they were working because that's what plaintiffs' counsel told you to assume, correct?

          MS. NOBILE:  Objection.  Mischaracterizes.

A.   Implicitly.

          THE COURT:  I'll allow that.

          THE WITNESS:  I'm sorry.

          THE COURT:  That's OK.

Q.   That's a yes?

A.   Implicitly.  That assumption is implicit in their instruction, yes.

Q.   Again, you have no idea how they arrived at that assumption, correct?

A.   That's correct.

Q.   And now, in looking at the CityTime data that you had available to you, you testified that you could determine when a plaintiff clocked in, correct?  You could see that?

A.   Yes.

Q.   So you could determine the percentage of shifts on which a plaintiff arrived between zero and five minutes prior to their shift, correct?

A.   I can do that calculation, yes.

Q.   So you could confirm that Todd Bilgore on 97 percent of his shifts clocked into CityTime within five minutes of his shift starting, correct?

MS. NOBILE: Objection. Assumes facts not in evidence.

THE COURT: The issue is, in the data that you had, could you have done that calculation?

THE WITNESS: I could have done that calculation, yes.

THE COURT: Again, ladies and gentlemen, the question is not evidence. It's the witness' answer that's evidence. OK. Go ahead.

Q. And you also could have conducted a calculation to determine that plaintiff Mark Estick clocked into CityTime between zero and five minutes of his shift starting on 80 percent of his shifts, correct?

MS. NOBILE: Objection.

THE COURT: Again, same thing.

Did you have the data that you could have conducted that analysis?

THE WITNESS: I could have conducted that analysis, yes.

Q. You also could have conducted an analysis to determine whether plaintiff Mykka Richardson clocked in between zero and five minutes of the start of her shift on 72 percent of her shifts, correct?

MS. NOBILE: Objection.

THE COURT: You can answer that.

A. I could have done an analysis, yes.

Q. You also could have done an analysis to determine that plaintiff Avian Rutherford clocked into CityTime within five minutes of his shift starting on 70 percent of his shifts, correct?

MS. NOBILE: Objection.

THE COURT: I'll allow it.

A. I could do that analysis.

Q. But you did not do that analysis, right?

A. That's correct.

Q. And you did not do that analysis because plaintiffs' counsel did not instruct you to do that analysis, right?

A. That's correct.

Q. Now, looking at postshift, you could have conducted an analysis to determine that Gina Bellido clocked out within five minutes of her tour ending on 74 percent of her shifts, correct?

MS. NOBILE: Objection.

THE COURT: I'll allow it.

Did you have the data to perform that sort of analysis?

THE WITNESS: I did.

Q. And you could have performed a data analysis to determine whether or not plaintiff Mykka Richardson clocked out between zero and five minutes of the end of her tour on 73 percent of her shifts, correct?

MS. NOBILE:  Objection.

THE COURT:  I'll allow it.

Same thing, Doctor.  Did you have the data?

THE WITNESS:  I had the data to do that.

Q.  So you could have conducted those analyses, correct?

A.  I could have, yes.

Q.  And you did not do so because plaintiffs' counsel did not instruct you to do that, correct?

A.  That's correct.

MS. O'CONNOR:  If we could please pull up Exhibit K1.

Q.  Do you see that, Dr. Lanier?

A.  Exhibit K1, yes.

Q.  I want to have you look at Sunday, June 9.  Do you see that?

A.  Yes.

Q.  And on this day Ms. Bellido was paid for 11 and a half hours of overtime, correct?

MS. NOBILE:  Objection.

THE COURT:  Is this a document that's in evidence?

MS. O'CONNOR:  Yes, your Honor.

THE COURT:  You can answer the question.

Have you ever seen one of these before?

THE WITNESS:  I have seen one before, yes.

THE COURT:  Go ahead.

Q.  So you see where it says Sunday, 6/9?

A. Yes.

Q. That's Sunday, June 9. If you look down that column it says: Overtime, 11:30.

Do you see that?

A. Yes.

Q. And that means she was paid 11 and a half hours of overtime, correct?

MS. NOBILE: Objection.

THE COURT: If you know.

A. That's what's reported here in this data.

Q. And if you can see where it says time out, again, on the left-hand side, you see time out?

A. Yes.

Q. And for Sunday you see that it's 18:39, which is 6:39 p.m.?

A. Yes.

MS. O'CONNOR: If we could go to the second page, please. Sorry. Third page.

Q. And here in the box in the middle of the page it indicates overtime that is requested on a particular day. On Sunday, June 9, there is no entry for 6:30 to 6:39 p.m., correct?

A. That's correct.

MS. O'CONNOR: If we could go back to the first page.

Q. Now, you see the line where it says noncompensable hours?

A. Yes.

Q. And you see on Sunday, June 9, it says 15 minutes?

A.   Yes.

Q.   And those 15 minutes are attributable to the time between Ms. Bellido's overtime request ended and the time she punched out, correct?

A.   Presumably, yes.

Q.   In other words, those 15 minutes cover the time between 6:30 and 6:39?

A.   Yes.

Q.   And CityTime lists those nine minutes as 15 minutes because of rounding?

A.   Yes.

Q.   On this particular day you would say that Ms. Bellido is eligible for damages, correct?

A.   That depends on how the week turned out.

Q.   We can see that her total hours for the week are 62.

Do you see that?

A.   OK.

Q.   On this particular day she would be eligible for 15 minutes of damages, correct?

A.   Yes.  Again, with the caveat that to the extent this matches the payroll data, because ultimately my hours of information comes from the payroll data.  But if this matches to the payroll data, then the 62-hour week, those 15 minutes would generate damages.

Q.   And you would say that she was entitled to 15 minutes of

overtime pay even though she only requested to be paid overtime on this day until 6:30 p.m., correct?

MS. NOBILE:  Objection.

THE COURT:  I'll allow it.  Overruled.

A.  This data would generate 15 minutes worth of damages, yes.

Q.  When you say it would generate 15 minutes of damages, that's because you are assuming that she worked from 6:30 to 6:39 p.m.?

MS. NOBILE:  Objection.

THE COURT:  I'll allow it.

Overruled.

A.  Implicitly.  I was valuing the noncompensable hours that has the implicit assumption that she was working, yes.

Q.  In order to be eligible for damages under the FLSA, you have to have been actually working, correct?

MS. NOBILE:  Objection.

THE COURT:  Do you know?

THE WITNESS:  I would assume, but I don't know.

Q.  I think counsel would stipulate that you have to have been actually working to receive compensation under the FLSA?

THE COURT:  We are not doing that now.

Ladies and gentlemen, there will come a time when I will give you instructions on the law.

As I mentioned at the beginning, the evidence can come in in different ways.  One way is a stipulation.  Right now we

don't have a stipulation. But I will give you the instructions on the law. Even if there was a stipulation about that, I'm giving you the instructions on the law and that would include related to the FLSA.

Go ahead.

MS. O'CONNOR: Thanks, your Honor.

Q. Let's look at Monday, June 10. On this day Ms. Bellido was paid overtime for 15 minutes, correct?

A. Yes, according to this sheet, yes.

MS. O'CONNOR: And can we turn to page 3.

Q. Those 15 minutes are attributable to time worked from 3 p.m. to 3:15 p.m., which is 1500 to 15:15, correct?

A. That's correct.

MS. O'CONNOR: If we could go back to the first page, please.

Q. Now, this day also lists 15 minutes of noncompensable time, correct?

A. It does, yes.

Q. These 15 minutes are attributable to the time period from 3:15 to 3:35?

A. Yes.

Q. And this gets rounded from 20 minutes down to 15 minutes because of rounding, correct?

A. Yes.

Q. And you would find that on this particular day Ms. Bellido

is eligible for 15 minutes of postshift overtime damage,
correct?

A.  Yes.  Based on data in this sheet, yes.

Q.  And you would reach that conclusion even though she
requested and was paid for 15 minutes of postshift overtime on
the same day, right?

        MS. NOBILE:  Objection.

        THE COURT:  I'll allow that.  Again, based upon the
sheet that's in front of you.

A.  Yes.  Based upon the sheet that's in front of me.

Q.  And you did not consider the scenario in which a plaintiff
had noncompensable time, let's say postshift noncompensable
time and postshift overtime paid.  You did not consider that
scenario, correct?

        MS. NOBILE:  Objection.

        THE COURT:  Did you consider that?

        THE WITNESS:  The noncompensable or uncompensated
minutes that I valued were without regard to whether there was
approved or disapproved overtime on a given day.

Q.  So you ignored the fact that there may have been overtime
paid on a particular day?

        MS. NOBILE:  Objection.

        THE COURT:  It didn't enter into your analysis.  Is
that what you are saying?  In other words, as I understood what
you said, noncompensable or uncompensated minutes you valued

but without regard to whether or not there had been an approved

overtime.  Is that accurate?  Or disapproved.

THE WITNESS:  Yes.

THE COURT:  Was that without regard if that was

requested and received or not requested and denied?  Whether it

was requested and received or not requested on any given day.

THE WITNESS:  That's correct.

THE COURT:  Go ahead.

MS. O'CONNOR:  Thank you, your Honor.

If we could please pull up Exhibit B5, Defendants' B5.

Q.  Dr. Lanier, I would like to direct your attention to

Sunday, May 27.

A.  OK.

Q.  And here Mr. Ingram clocked in at 6:52 a.m.?  You see that?

A.  I do.

Q.  And he clocked out at 3:18 p.m., correct?

A.  Yes.

MS. O'CONNOR:  And we can turn to either the second or

third page.

Q.  He requested to be paid for time he spent working between 3

p.m. and 3:15 p.m., correct?

A.  Yes.

MS. O'CONNOR:  We could go back to the front page.

Q.  So the 15 minutes of noncompensable time that's listed for

this day are attributable for the time period between 6:52 a.m.

and 7 a.m., correct?

A. And I guess they would also include the extra 30 minutes beyond 3:15, right?

Q. Three minutes postshift would round down to zero, correct?

A. Right. You got noncompensable hours here and presumably that has both pre and post. I am just saying that there is three minutes on one end and eight minutes on the other.

Q. If there is three minutes of uncompensated time, that gets round down to zero, correct?

A. Does it on this sheet? I don't know if it does on this sheet.

Q. Dr. Lanier, you testified as to rounding on direct and you testified that anything between zero and seven gets round down to zero minutes, correct?

A. In the CityTime data, is this actually a printout --

Q. It is.

A. Yes. The three would get -- if it were in that separate field, it would get rounded down, you are right, yes.

Q. So the 15 minutes of noncompensable time is attributable to the time between 6:52 a.m. and 7 a.m., when this individual's tour started, correct?

A. Yes.

Q. And on this day you would find Mr. Ingram eligible for 15 minutes of damages, correct?

A. According to this sheet, yes.

Q.   And you would award him 15 minutes of damages even though he scanned in at 6:52, correct?

A.   Correct.

Q.   So you were awarding him damages as though he started working at 6:45 a.m., correct?

        MS. NOBILE:  Objection.

        THE COURT:  Well, I'll allow it.  Objection overruled.

A.   It could be thought of that way.

        MS. O'CONNOR:  We could take this down.

Q.   The CityTime data you reviewed showed instances of preshift approved overtime, correct?

A.   Yes.

Q.   And isn't it true that, based on your own calculations, from February 13 of 2010 to March 21 of 2015, you found that there were more than 150,000 instances of approved preshift overtime?

        MS. NOBILE:  Objection.

        THE COURT:  Was that one of your calculations?  That between February 13 of 2010 and March 21 of 2015 that there were more than 150,000 instances of approved preshift overtime?

        THE WITNESS:  I don't recall that calculation.

        THE COURT:  Next question.

        MS. O'CONNOR:  Your Honor, may I approach to refresh? The witness testified --

        THE COURT:  Sure. Do you have one?

Is there a place where you would like to direct Dr. Lanier?

MS. O'CONNOR:  Yes, your Honor.  Paragraph 4A.

Q.  Does that refresh your recollection as to whether or not there are more than 150,000 instances of approved preshift overtime for the plaintiffs in the time period of February 13, 2010 to March 21 of 2015?

A.  Yes.

Q.  And that's correct, right?

A.  Yes.

Q.  And there are occasions on which a plaintiff is paid preshift overtime on the same day that you find that they are entitled to damages for preshift noncompensable time, correct?

MS. NOBILE:  Objection.

THE COURT:  If you know.  Do you remember?

THE WITNESS:  That's certainly possible.

Q.  And that's something you could determine based on the data you had received, correct?

A.  Yes.

Q.  And the same --

THE COURT:  B5?  I am not sure that that is in evidence.

MS. O'CONNOR:  I move for its admission.

THE COURT:  Any objection to B5?

MS. NOBILE:  No, your Honor.

THE COURT:  Defendants' B5 is admitted in evidence.

(Defendants' Exhibit B5 received in evidence)

MS. O'CONNOR:  If we could pull up what's been marked for identification as Defendants' H6.  This is a time sheet for plaintiff Jason Jones for the week ending October 10, 2015, and I move for its admission.

THE COURT:  Any objection?

MS. NOBILE:  No objection.

THE COURT:  Defendants' Exhibit H6 is admitted in evidence.

(Defendants' Exhibit H6 received in evidence)

Q.  Dr. Lanier, I would like you to look at Monday, October 5.

A.  OK.

Q.  On this day Mr. Jones clocked in at 9:57 a.m.?

A.  Yes.

Q.  And that's three minutes prior to his scheduled tour, and he clocked out at 6:44 p.m., correct?

A.  Yes.

Q.  If we turn to page probably 2, on this particular day he requested to be paid overtime from 6 p.m. to 6:34 p.m.

Do you see that?

A.  I see that, yes.

Q.  He did not request to be paid for the time period from 6:34 to 6:44 p.m., correct?

MS. NOBILE:  Objection.

THE COURT:  Rephrase the question.

Q.  This time sheet doesn't indicate that he requested to be paid for the time period 6:34 to 6:44, correct?

A.  That's correct.

MS. O'CONNOR:  Will you go back to the front page, please.

Q.  On this particular day the 15 minutes of noncompensable time is attributable to the 10 minutes between the end of his overtime request and the time he clocked out, right?

A.  Yes.

Q.  And you would assess 15 minutes of damages for this particular day, right?

A.  Yes.

Q.  And you would do that even though he requested to be paid for 30 minutes of overtime, correct?

A.  Yes.

Q.  And the fact that a plaintiff requested overtime on a day that they also have noncompensable time again, that did not factor into your damage calculation at all, right?

A.  That's correct.

Q.  And that's because plaintiffs' counsel told you not to factor that in, correct?

A.  I don't know if they ever actually specifically said don't factor that in.  They just said, value the uncompensated minutes fields.

Q.  Again, you have no idea how they arrived at the implicit assumption that the plaintiffs were working during the time captured as noncompensable, right?

MS. NOBILE:  Objection.  Asked and answered.

THE COURT:  I'll allow it.  Objection overruled.

A.  That's correct.

MS. O'CONNOR:  Your Honor, one minute, please.

THE COURT:  Yes.

MS. O'CONNOR:  No further questions, your Honor.

THE COURT:  Redirect.

MS. ELKIN:  I just want a comfort break, if that's possible.

THE COURT:  OK.  Ladies and gentlemen, we are going to take a break.  I assume the snack is there, if the general is up to her usual high standards.

Do not talk about the case.  You can leave your pads on your chairs.  We will come and get you in about 15 minutes. Enjoy your break.  Remember, we are leaving promptly at 5:25.

(Jury not present)

THE COURT:  You can step down, Doctor.

MS. O'CONNOR:  Your Honor, will you give an instruction to this witness also?

THE COURT:  Technically, you passed the witness. Doctor, you are not to have substantive conversations with plaintiffs' counsel during the break.

THE WITNESS:  Sure.

THE COURT:  Technically, that's, I think the way it typically works, but I'll give that instruction.

Is there anything that we need to take up right now?

MS. ELKIN:  Nothing for the plaintiffs, Judge.

THE COURT:  From the defense.

MS. O'CONNOR:  Not right now, no.

THE COURT:  Thank you very much.  See you in about 15 minutes.

(Recess)

THE COURT:  Anything we need to take up?

MS. O'CONNOR:  Your Honor, I don't know if this is appropriate to raise with the witness --

THE COURT:  Doctor, if you could step out for a moment.

MS. O'CONNOR:  Yes, your Honor.  We will be moving to strike the doctor's testimony.  As we have noted numerous times, the doctor testified that there were assumptions made that were provided to him by counsel that he cannot testify as to what those assumptions were based on.

We have case law that instruction from counsel is not a substitute for expert testimony based on reliable testing analysis and methodology.  There are many Second Circuit cases, but one in particular that indicates that an expert's reliability has to be able to be tested at every step.

Here we have the first step where there was an assumption made that the time captured in the noncompensable field was time worked.  We don't know how that assumption was arrived at.  We know that counsel gave him that instruction.  We don't know how they arrived at that assumption.  Without that critical step, the doctor's testimony is unreliable and should be stricken.

THE COURT:  I can tell you what my initial thought is, which is you should -- both sides should brief it, and I'll render a decision before the case.  Obviously, again, I know you will be making motions before the jury gets the case.

MS. O'CONNOR:  Your Honor, we can have a brief to you over the weekend.

THE COURT:  That's fine.

MS. NOBILE:  Your Honor, briefly, in response, we can also cite cases in a collective action such as this one where an expert can be used to summarize and calculate damages in a case based on information provided by counsel as to how to value certain aspects of the data.

THE COURT:  I have no doubt there is going to be cases on both sides.  I'll take a look at them and make a decision.  What I'm saying is, both sides should submit papers to me.

MS. NOBILE:  Thank you, your Honor.

MS. O'CONNOR:  Thank you, your Honor.

THE COURT:  Can we get the doctor?

MS. NOBILE:  Sure.

THE COURT:  Thank you.

Doctor, you can step up.  We are going to get the jury.  I just ask you to remain standing until they are in, and then you can have a seat.  Thank you.

(Jury present)

THE COURT:  Redirect examination.

MS. NOBILE:  Thank you, your Honor.

REDIRECT EXAMINATION

BY MS. NOBILE:

Q.  Dr. Lanier, in your calculation of damages did your calculation take into account instances in which plaintiffs were paid for overtime?

A.  Yes.

Q.  I am going to ask you to take a look at Defendants' B5.  If you could look at Wednesday, 5/30.

A.  OK.

Q.  Do you see that?

A.  I do.

Q.  Do you see that there is a time in recorded on that day at 6:53?

A.  Yes.

Q.  And with a shift start time of 7, how would that be recorded in the uncompensated minutes field or the noncompensable minutes field?

A. That's seven minutes early, so the seven would get rounded to zero.

Q. And in your calculations you used rounded, uncompensated preshift minutes that are recorded in the city's CityTime data, is that right?

A. That's correct.

Q. And in your calculations you used the rounded, uncompensated postshift minutes that are recorded in the city's CityTime data, is that right?

A. That's correct.

Q. And you were asked some questions when looking at a time sheet involving a week a plaintiff was scheduled to work 32 hours. And I believe you mentioned the difference between FISA data and CityTime data and when they might disagree. Can you just explain what happens in those circumstances.

A. Yes. I recall the example being where the CityTime data was showing the total of like 38 and a half hours or something for the week, and I was told that I had calculated damages for that person for that week and referred to a discrepancy between the payroll data and the CityTime data. And the reason I did is because what has to be going on in this case is that the payroll data on which my calculations are based must be disagreeing with what we were looking at in the CityTime data at the time. That's why I would be calculating damages for that person is because the payroll data would have been

indicating something different from what we were looking in the CityTime data.

Q.   When that happens, what do you default to?

A.   I default to the payroll data.

Q.   Why?

A.   A long time ago I learned -- I've been involved in a lot of these types of cases, and I learned that when there are those types of discrepancies to default to the payroll data on the idea that the payroll data is the data from which employees are paid.  You can think of as kind of being a more final product in the chain of things that has to happen for someone to get paid whereas in this case the information from CityTime would feed into the payroll system.  Somehow it would be more than immediate.  The payroll system would then be what was used to pay.  Like I said, I just learned a long time ago that in my experience the payroll data was what to default to.

Q.   You were asked some questions about the actual minutes recorded in CityTime.  Why didn't you use the actual minutes recorded in CityTime in preparing your calculations?

A.   I was asked to basically work within the CityTime system, that is, to value the uncompensated minutes -- uncompensated preshift and uncompensated postshift minutes as they are recorded, rounded or not, as they are recorded in the CityTime system itself.

Q.   Based on your observations, could using the actual minutes

have presented problems?

MS. O'CONNOR:  Objection.

THE COURT:  Sustained.

As you were doing the analysis, are there any specifics relating to the work that he did?  How about, was there a reason why you didn't use the actual minutes?

THE WITNESS:  I'm sorry.

THE COURT:  That's OK.

THE WITNESS:  Well, the reason is, I was instructed to use the uncompensated minutes.

Q.  And did the particular shifts and types of shifts worked by the plaintiffs present issues in calculating damages based on actual minutes?

MS. O'CONNOR:  Objection, your Honor.

THE COURT:  I'll allow that.  Overruled.

A.  On a couple of different occasions, I think three different occasions over the past -- since I started working on this case in April of 2015, I have attempted to compare a calculated version of preshift and postshift minutes to the uncompensated reporting of preshift and postshift minutes, and I have found that, of course, on the standard day, where you have an amount of time worked and say the shift was scheduled from 9 to 5, the person punched in at 8:45, they punched out at 5:15.  It's very simple subtraction to figure out that there is 15 minutes prior and 15 minutes after.

What I found, though, in trying to calculate and do my own calculation preshift to postshift is that when you get away, when work time gets away from the scheduled time, say a person works a full shift, but they work it an hour later or they work it at a different time of the day, or something like that, or when there are multiple punches in and out, gaps in time, people take leave, when multiple shifts are worked, various things across the four million lines of data in the CityTime data set, those nonstandard days present issues where the only way to get past them is to start making assumptions as to when the shift started and when they ended so you can actually define some preshift and postshift minutes.

I always on every occasion where I have tried to calculate those preshift and postshift minutes myself, I've always gotten to a point where it just became what I felt was infeasible, given the amount of assumptions I was having to make in order to be able to define those things.

Q.  And you were asked some questions about preshift overtime. In the CityTime data, is that called prior approved overtime?

A.  I believe so, yes.

        MS. O'CONNOR:  Objection.

        THE COURT:  I'll allow it.  Overruled.

Q.  I believe you testified earlier that less than 1 percent of the time plaintiffs were paid for punches of 15 minutes or less before the start of their shift, is that right?

MS. O'CONNOR:  Objection.

A.  Less than 1 percent --

THE COURT:  I'll allow you to answer the question.
Objection overruled.

A.  Less than 1 percent of the time.  In less than 1 percent of
the time was I able to find a matching number of prior approved
overtime minutes that matched the calculated preshift minutes.
Less than 1 percent of the time was I able to find that match.

MS. NOBILE:  I don't have anything further, your
Honor.

THE COURT:  Anything else?

MS. O'CONNOR:  Yes, your Honor.

RECROSS EXAMINATION

BY MS. O'CONNOR:

Q.  Hello again.

You testified just now about when there are
discrepancies between the payroll data and the CityTime data,
correct?

A.  Yes.

Q.  And you testified that when there is a discrepancy between
the payroll data and the CityTime data you default to the
payroll data, correct?

A.  Yes.

Q.  But you could have gone to the CityTime data to check to
see whether or not an employee actually worked 40 hours in a

week in which there was a discrepancy, correct?

MS. NOBILE:  Objection.

THE COURT:  Did you have that data?

THE WITNESS:  I would say that's not correct.

Can I explain?

THE COURT:  Unless she asks the next question.

Q.  Dr. Lanier, you had the capability to calculate the number of hours an employee worked in a week, right?

A.  I had two ways of being able to do that.

Q.  And when there was a discrepancy between the payroll data and the CityTime, you could have gone to the other data set to check why there was a discrepancy, correct?

A.  I don't think there is any way to know why there is a discrepancy.

Q.  I am not asking you why there was a discrepancy.  I am saying, you could have consulted with the other data set when there was a discrepancy, correct?

A.  I could have.

Q.  But you didn't do that.

A.  No.

Q.  You just defaulted to one data set, correct?

A.  You have to choose one or the other.

Q.  You could have consulted both when there was a discrepancy, correct?

MS. NOBILE:  Objection.

THE COURT:  Asked and answered.  Sustained.

Q.  And you testified that you work within the CityTime system for the purposes of noncompensable time, right?

A.  Yes.

Q.  But despite that fact, you defaulted to the payroll data when there was a discrepancy?

MS. NOBILE:  Objection.

THE COURT:  I'll allow that.  Overruled.

A.  The CityTime data are the only source of uncompensated time, so there couldn't be a discrepancy with payroll there. That's the only place I could get the uncompensated time.  But the rest of where there is overlap between the two of some type, then I would default to the payroll.

MS. O'CONNOR:  No further questions.

MS. NOBILE:  Nothing further.

THE COURT:  Doctor, you can step down.

(Witness excused)

THE COURT:  Ms. Elkin.

MS. ELKIN:  Your Honor, we rest.

THE COURT:  Ladies and gentlemen, the plaintiffs have rested.  You may have gauged that we are probably moving a little bit faster than we anticipated, but I have to now speak with the lawyers about some things.

I am going to ask you to go back and relax, and we will come and get you when we are ready for you with the

# APPENDIX B

JA45perC                        conference

He is making that assumption.  And Dr. Erath is going to point out these assumptions as being, in his opinion, not appropriate.

Likewise, plaintiffs are taking the position that it's necessary for them to arrive at work early and that the City has a policy of not paying people for doing work before their shift.  Well, one of the points that Dr. Erath has pointed out in his rebuttal report is how can there be a requirement that people come to work early and be paid when so many people show up a minute before their shift begins?  I think he has 48 percent of the time scans in are within a couple of minutes of when the shift begins and he is going to address that assumption made by Dr. Lanier, which is what economists do.  They talk about assumptions, they don't just do math.

THE COURT:  All right.

MS. NOBILE:  Your Honor, if I may respond?

The characterization that Dr. Lanier made any assumptions is inaccurate.  Dr. Lanier's report and his testimony will explain to the jury that he was instructed by plaintiff's counsel to look at the uncompensated minutes and assign damages, figure out the value of the claim for up to 15 minutes before the shift and up to 15 minutes after a shift.  He is making no assumptions about whether or not that time was worked.  He is simply saying this is the amount of that claim up to 15 minutes per day.  It is what is recorded in CityTime

JA45perC                        conference

and he is simply putting a value to that and we will prove to the jury, through our testimony of the plaintiffs, that up to 15 minutes per day recorded on the clock and CityTime at beginning of the shift, and up to 15 minutes per day, the recorded on CityTime at the end of the shift we will proof that through our plaintiffs --

THE COURT:  Listen to what you just said, though.  "We will prove that through our plaintiffs."  So the doctor, as I understand it, doesn't have that information.  He is told the parameters under which he is to create his report.

MS. NOBILE:  He is saying, your Honor, if you do the math based on what's recorded in the City's own records up to 15 minutes per day pre-shift and 15 minutes per day post-shift, the amount at issue is X.  And so, they are not assumptions that he is making, they're the parameters that we gave him for carrying out the damages calculations.

THE COURT:  And when you say we gave him, where did that come from?  Is that based upon the plaintiffs' testimony?

MS. NOBILE:  It is based on the data in CityTime and the claims at issue in this case.

MS. EKELMAN:  It is based on an instruction from counsel I just heard.

MS. NOBILE:  That's what we instructed him to do and that is what he puts in his report and he explained:  At the instruction of counsel, this is the parameters that I used.