UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- X

CHAZ PERRY et al.,

                      Plaintiffs,

      - against -

THE CITY OF NEW YORK et al.,

                    Defendants.

------------------------------------------------------- X

:
:
:
:
:
:
:
:
:
:
:
:
:

```
┌──────────────────────────────────────┐
│ USDC SDNY                            │
│ DOCUMENT                             │
│ ELECTRONICALLY FILED                 │
│ DOC #:                               │
│ DATE FILED:  ___8/5/2021___          │
└──────────────────────────────────────┘
```

13-CV-1015 (VSB)

**OPINION & ORDER**

<u>Appearances</u>:

Molly A. Elkin
Sara L. Faulman
Diana J. Nobile
Sarah M. Block
McGillivary Steele Elkin LLP
Washington, D.C.

*Counsel for Plaintiffs*

Felice B. Ekelman
Mark Mancher
Michael A. Frankel
Jackson Lewis P.C.
New York, NY

Andrea O'Connor
Corporation Counsel of the City of New York
New York, NY

*Counsel for Defendants*

VERNON S. BRODERICK, United States District Judge:

Before me is the motion for judgment as a matter of law or, in the alternative, motion for a new trial or an amended judgment filed by Defendants the City of New York (the "City") and the New York City Fire Department ("FDNY," and, together with the City, "Defendants"). (Doc. 318.)  Because I find that Defendants failed to meet their substantial burden needed to warrant a judgment as a matter of law and failed to demonstrate that the jury reached a seriously erroneous result or that the verdict was a miscarriage of justice, Defendants' motion is DENIED.

## I.      **Factual Background and Procedural History**

Plaintiffs are 2,519 current or former Emergency Medical Technicians ("EMTs") and Paramedics below the rank of lieutenant in the FDNY, and they brought this action against Defendants to recover unpaid compensation under the Fair Labor Standards Act (the "FLSA"), 29 U.S.C. § 201 *et seq.*  (Doc. 115.)[1]  On October 24, 2019, after a three-week trial, a ten-member jury returned a unanimous verdict in Plaintiffs' favor, finding that Defendants violated the FLSA by failing to compensate Plaintiffs for work done before and after their compensated shifts.  (Doc. 269.)  Specifically, the jury found that Plaintiffs proved, by a preponderance of the evidence, that:

- Defendants have a policy or practice of suffering or permitting the Plaintiffs to work before their shift without pay, in violation of FLSA;
- Defendants have a policy or practice of suffering or permitting the Plaintiffs to work after their shift without pay, in violation of FLSA;
- The CityTime system accurately captures the unpaid pre-shift work minutes at issue in this case;
- The CityTime system accurately captures the unpaid post-shift work minutes at issue in this case; and

---

[1] The twenty-seven Fire Protection Inspector and Associate Fire Protection Inspector Plaintiffs settled with Defendants and did not proceed to trial.  (Doc. 222.)  These Plaintiffs submitted their settlement to the Court for separate approval on October 31, 2019, (Doc. 274), which I granted on February 13, 2020, (Doc. 315).  Because trial was limited to the issue of compensation for Plaintiffs' unpaid pre-shift and post-shift overtime, trial in this case involved only 2,519 of the 2,524 remaining EMT and Paramedic Plaintiffs.  (*See* October 4, 2019 Final Pretrial Conference Transcript, at 16:18-19.)

- Defendants willfully violated the FLSA.

(*Id.*)  On December 23, 2019, I issued an Opinion & Order granting Plaintiffs' motion for entry of final judgment.  (Doc. 307.)  On February 5, 2020, I issued final judgment in this case, awarding Plaintiffs $17,780,063.00 to be allocated as follows:  $7,238,513.00 in backpay, $7,238,513.00 in liquidated damages, and $3,303,037.00 in attorneys' fees and expenses pursuant to 29 U.S.C. § 216(b).  (Doc. 313.)

On March 4, 2020, Defendants filed this renewed motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b), or, in the alternative, a motion for a new trial or remittitur of the judgment pursuant to Fed. R. Civ. P. 59(a), along with a memorandum of law, declaration, and exhibits.  (Docs. 318–20.)  Plaintiffs filed their response in opposition to Defendants' motion on April 3, 2020, with an accompanying declaration and exhibits.  (Docs. 327–28.)  This motion became fully briefed when Defendants filed their reply memorandum of law on April 17, 2020. (Doc. 329.)

On March 10, 2021, Plaintiffs filed a letter bringing to my attention a recent decision by Judge Alison J. Nathan in *Campbell v. City of New York*, 1:16-cv-08719-AJN (S.D.N.Y. Mar. 4, 2021), related to the testimony of Plaintiffs' expert Dr. Louis Lanier.  (Doc. 330.)  In a letter dated March 31, 2021, Plaintiffs brought to my attention a recent decision by Judge Paul G. Gardephe in *Foster v. City of New York*, 1:14-cv-04142 (S.D.N.Y. Mar. 30, 2021), adopting the Report and Recommendation of Magistrate Judge Robert Lehrburger finding that Plaintiffs in that case were similarly situated to each other.  (Doc. 331.)

## II.    <u>Legal Standards</u>

### A.    *Rule 50(b)*

"Under Rule 50(a), a party may move for judgment as a matter of law ('JMOL') during trial at any time prior to the submission of the case to the jury." *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 286 (2d Cir. 1998) (citing Fed. R. Civ. P. 50(a)(2)). "The Rule requires the party making such a motion to specify the judgment sought and the law and the facts on which the moving party is entitled to the judgment.'" *Tolbert v. Queens Coll.*, 242 F. 3d 58, 70 (2d Cir. 2001) (internal quotation marks omitted) (citing Fed. R. Civ. P. 50(a)(2)). "After an unfavorable verdict, Rule 50(b) allows the party to 'renew' its motion." *Galdieri-Ambrosini*, 136 F.3d at 286.

"A district court may grant a motion for judgment as a matter of law only if it can conclude that, with credibility assessments made against the moving party and all inferences drawn against the moving party, a reasonable juror would have been *compelled* to accept the view of the moving party." *Emamian v. Rockefeller Univ.*, 823 F. App'x 40, 45 (2d Cir. 2020) (internal quotation marks omitted) (emphasis in original). "Judgment as a matter of law should be granted only when (1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against it." *Id.* (internal quotation marks omitted).

### B.    *Rule 59*

"[F]or a district court to order a new trial under Rule 59(a), it must conclude that the jury has reached a seriously erroneous result or . . . the verdict is a miscarriage of justice, i.e., it must view the jury's verdict as against the weight of the evidence." *Manley v. AmBase Corp.*, 337

F.3d 237, 245 (2d Cir. 2003) (internal quotation marks omitted).  "Unlike judgment as a matter of law, a new trial may be granted even if there is substantial evidence supporting the jury's verdict.  Moreover, a trial judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner."  *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 134 (2d Cir. 1998).  That said, "the court should only grant such a motion when the jury's verdict is egregious," and the "court should rarely disturb a jury's evaluation of a witness's credibility."  *Id.* (internal quotation marks omitted).

### III.   Discussion

#### A.   *Rule 50(b)*

##### 1.  The Finding That the City had a Policy or Practice

Defendants first argue that "no reasonable jury could conclude that Defendants had an unlawful FDNY-wide policy or practice of suffering or permitting Plaintiffs to work without pay in violation of the FLSA."  (Doc. 319, at 2.)  Defendants are correct that there was no operative written policy or practice suffering or permitting such work, (Doc. 329, at 3), a fact that Defendants emphasized in their arguments to the jury, (*see* Tr. 2000:7-9, 2011:13-18.)  Yet neither the statute nor case law specifies that a policy or practice must be written; rather, it merely must be "systematically-applied."  *Scott v. Chipotle Mexican Grill, Inc.*, 954 F.3d 502, 516 (2d Cir. 2020); *Foster v. City of N.Y.*, 14-CV-4142 (PGG) (RWL), 2020 WL 8173266, at *9 (S.D.N.Y. Oct. 30, 2020).

There are four main reasons why Defendants do not come close to meeting their substantial burden under Rule 50(b), and why the jury did not have a "complete absence of evidence supporting" its verdict.  *Emamian*, 823 F. App'x at 45 (internal quotation marks omitted).  First, the jury heard sufficiently specific testimony from many witnesses, particularly

on direct testimony, that Plaintiffs regularly engaged in unpaid pre-shift, (*see* Doc. 327, at 6–7), and post-shift, (*see id.* at 7–9), work.  Defendants appear to acknowledge that the jury heard at least some direct testimony that supported Plaintiffs' claims, but they argue that such testimony "did not hold up to cross-examination."  (Doc. 329, at 2–3.)  Defendants' concession is telling and essentially proves the point:  Plaintiffs elicited useful direct testimony, Defendants were able to poke some holes in it on cross-examination, and the jury performed its role of parsing through it all and coming to a conclusion.  I see nothing in the record that would indicate that the jury acted in a manifestly unreasonable way, or that there is a complete absence of evidence supporting the verdict for Plaintiffs such that I must take the extraordinary step of overruling their judgment and credibility determinations.[2]

    Second, it was reasonable for the jury to find that Defendants' failure to implement its 2008 draft policies was sufficient evidence not just that pre-shift and post-shift was occurring, but that Defendants had at least a *de facto* policy of permitting such work.  The jury reviewed evidence that Defendants had drafted Command Orders in 2008 that prevented EMTs and Paramedics from performing work-related tasks before or after their shift unless specifically approved, (Doc. 328-12), but that these orders were not formally issued until 2014, (Doc. 328-9).  During trial, Defendants failed to provide a justification for why the 2008 draft policy was not issued in the intervening six years.  (*See, e.g.*, Tr. 1044:17-1045:3.)  Without any clear justification from Defendants, it was reasonable for the jury to determine that Defendants were

---

[2] The jury, as the finder of fact, is free to accept all, some, or none of any given witness' testimony.  *See United States v. Norman*, 776 F.3d 67, 77 (2d Cir. 2015) ("It is the job of the factfinder in a judicial proceeding to evaluate, and decide whether or not to credit, any given item of evidence.  Whether, and to what extent, testimony that has been admitted is to be credited are questions squarely within the province of the factfinder."); *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 227 (2d Cir. 2014) (noting that it "is left for the jury to decide at trial" whether to credit "all of [the] proffered evidence, some of it, or none at all") (internal quotation marks omitted); *Dodd v. City Univ. of N.Y.*, 489 F. Supp. 3d 219, 264 (S.D.N.Y. 2020) (similar).  Indeed, the jury was charged consistent with the law.  (*See* Tr. 2081:11-20.)  As such, it was the jury's prerogative to accept the bulk of the direct testimony submitted and to not find determinative any holes poked in that testimony on cross-examination.

aware that at least some pre-shift and post-shift work was happening, and that Defendants ultimately decided against instituting a policy to remedy the issue—either because Defendants did not want to pay the extra money or because they did not want to have to change the way they supervised and managed their employees.

Third, the trial record demonstrated that Plaintiffs for years performed post-shift narcotics audits and securement, but that Defendants did not provide an overtime code for that work until April 2016, (Doc. 328-14; *see, e.g.*, Tr. 545:2-5, 546:9-15), two years after the Command Orders that prevented EMTs and Paramedics from performing work-related tasks before or after their shift unless specifically approved were issued. It is reasonable for a jury reviewing this information to determine that Defendants—by issuing the policy providing the overtime code for the first time in April 2016 —acknowledged that Plaintiffs should have been, but were not, compensated for this work in the past. And fourth, the jury reviewed evidence that Plaintiffs' supervisors specifically praised employees in performance evaluations for performing pre-shift work, an indication that Defendants were encouraging and incentivizing EMTs and Paramedics to do this work.

The parties presented their respective weight of this evidence to the jury, and Defendants specifically argued to the jury that Plaintiffs could not point to a specific written policy. The four factors listed above, taken together, are more than sufficient to uphold the jury's findings in light of the demanding Rule 50(b) standard.[3]

---

[3] Defendants further argue that it was "sheer surmise and conjecture" for the jury to determine precisely how many minutes of pre-shift work Plaintiffs did, because Plaintiffs "fail[ed] to marshal any evidence quantifying" that work. (Doc, 319, at 6 (internal quotation marks omitted)). Even assuming that Plaintiffs failed to provide any quantitative evidence, this is irrelevant. The jury was presented with significant testimony regarding (1) the different types of pre-shift work at issue, (2) which witnesses did that work and which did not, and (3) the amount of time it took for the witnesses to conduct that work. As the finder of fact, the jury had more than enough information to assess all that testimony, determine the relevant activities at issue, and estimate based on the testimony before them how long those activities took together. The jury had sufficient evidence before it to come to a finding as to the amount of time Plaintiffs spent on pre-shift work.

### 2.  The Finding That Defendants' FLSA Violation was Willful

"An employer willfully violates the FLSA when it 'either knew or showed reckless disregard for the matter of whether its conduct was prohibited by' the Act."  *Young v. Cooper Cameron Corp.*, 586 F.3d 201, 207 (2d Cir. 2009) (quoting *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988)).  An employer can have reckless disregard for whether its conduct is prohibited by FLSA even where the employer "may not have had actual knowledge of the violative practices."  *Herman v. RSR Sec. Servs.*, 172 F.3d 132, 141 (2d Cir. 1999).

Here, it was surely reasonable for the jury to find that Defendants knew or showed reckless disregard that their conduct was violating FLSA.  The jury heard testimony that "thousands of EMTs and paramedics" in 2005 "put the City on notice that they wanted to be paid for pre-shift and post-shift work activities that they performed."  (Tr. 965:16-25; *see also, e.g.*, Tr. 204:7-10, 1121:3-9, 1199:24-1200:14.)  The jury also heard testimony that after the City was put on notice in 2005, the City failed to pay Plaintiffs for pre-shift and post-shift work.  (Tr. 411:6-11.)  Defendants explicitly acknowledge this testimony, noting that "over a half a dozen witnesses testified about how EMTs and Paramedics 'put the City on notice' in 2005 of the exact same alleged violations they were asserting at trial."  (Doc. 319, at 19.)  Defendants' arguments are inconsistent.  On the one hand, Defendants ask me to strike this testimony because it reasonably led the jury to believe there was FLSA litigation over this issue in the past, (*id.* at 20), while on the other hand simultaneously arguing that the jury could not reasonably believe that Defendants had knowledge or reckless disregard for potential FLSA violations based on the complaints from thousands of their employees.  The undisputed testimony related to Defendants' notice in 2005 is, on its own, fatal to Defendants' Rule 50(b) argument here.

Further, as referenced *supra*, the jury considered evidence that Defendants failed to adopt

or implement its 2008 draft policies prohibiting Plaintiffs from performing their work before or after their shift unless they received permission.  (Docs. 328-9, 328-12.)  It is reasonable for a jury to infer that Defendants arrived at this policy at least in part because they were aware that EMTs and/or Paramedics were performing unpaid pre-shift and post-shift work, in violation of FLSA, and created the draft policy in reaction to the complaints from EMTs and paramedics that they were not being paid for pre-shift and post-shift work activities.  It is similarly reasonable for a jury to infer that, by Defendants not implementing this policy for years despite it being approved, Defendants evaluated the problem and made a conscious decision to refrain from implementing the order, either to avoid paying Plaintiffs additional money or because the policy would force Defendants to change the way they managed EMTs and paramedics.  This latter inference—that Defendants failed to implement this policy for years because it would have forced them to change the way they managed EMTs and paramedics—is further supported by the fact that Plaintiffs' supervisors specifically commended employees in performance evaluations for performing pre-shift work.  In other words, the praise supervisors heaped upon employees for performing pre-shit work is an indication that such work was ingrained in the FDNY culture.

Finally, Defendants note that the backpay award "represents just 3.5% of the total amount of overtime compensation paid to Plaintiffs during the applicable time period."  (Doc. 319, at 11.)  Defendants suggest that this is a "relatively small overtime underpayment," (*id.*), presumably to argue that Defendants would not have bothered to violate the statute to avoid paying a relatively paltry sum.  While the award might constitute a small percentage, it amounts to nearly $6 million—a lump sum more than substantial enough for a reasonable jury to find sufficient motive.  Defendants' argument also ignores the fact that the City and FDNY likely had non-financial reasons to risk violating the statute including, as noted *supra*, a desire to avoid

changing the way they chose to manage EMTs and paramedics.  As noted above, the evidence

suggests that the way EMTs and paramedics performed their jobs, including performing pre-shit

work, was a tradition and practice that the FDNY did not want to change.

      **B.**    *Rule 59*

Defendants next argue that "the jury's verdict is against the clear weight of the evidence

and the damages are excessive" for eight separate reasons.  (*Id.* at 12.)  I will now discuss these

eight arguments in turn.

### 1.  The Finding That Plaintiffs Were Similarly Situated

"One of the principal conditions to proceeding collectively under [29 U.S.C.] § 216(b) is

that the named plaintiffs be 'similarly situated' to the opt-in 'party plaintiffs.'"  *Scott*, 954 F.3d at

515.  The burden of establishing that all plaintiffs are "similarly situated" pursuant to 29 U.S.C. §

216(b) "is considerably less stringent than the requirement of Fed. R. Civ. P. 23(b)(3) that

common questions 'predominate.'"  *Alonso v. Uncle Jack's Steakhouse, Inc.*, No. 08 Civ. 7813

(DAB), 2011 WL 4389636, at *3 (S.D.N.Y. Sept. 21, 2011) (internal quotation marks omitted).

"All that is required is a persuasive showing that the original and opt-in plaintiffs were common

victims of a FLSA violation pursuant to a systematically-applied company policy or practice

such that there exist common questions of law and fact that justify representational litigation."

*Pefanis v. Westway Diner, Inc.*, No. 08 Civ. 002(DLC), 2010 WL 3564426, at *4 (S.D.N.Y.

Sept. 7, 2010).  In other words, the plaintiffs must merely "share a similar issue of law or fact

material to the disposition of their FLSA claims," and "dissimilarities in other respects should

not defeat collective treatment."  *Scott*, 954 F.3d at 516 (internal quotation marks omitted); *see

also id.* (noting that "to be 'similarly situated' means that named plaintiffs and opt-in plaintiffs

are alike with regard to some material aspect of their litigation.").

Before trial, I granted Plaintiffs' motion for a finding that they are similarly situated under the FLSA. *Perry v. City of N.Y.*, No. 13-CV-1015 (VSB), 2019 WL 1146581 (S.D.N.Y. Mar. 13, 2019). I see no reason to depart from that determination in light of the trial record. As noted *supra*, the jury found that Defendants had a common policy of suffering or permitting the Plaintiffs to work before and after their shift without pay. (Doc. 269.) "[F]or FLSA claims based on a common policy or practice, courts routinely find that plaintiffs are similarly situated despite individualized issues such as those raised by the City here." *Adams v. City of N.Y.*, No. 1:16-cv-03445 (RA) (SDA), 2019 WL 5722054, at *7 (S.D.N.Y. Aug. 29, 2019); *see also id.* at *6 ("An individualized inquiry into each supervisor's knowledge regarding their subordinates' pre-shift, post-shift . . . work only will be required if Plaintiffs fail to establish that the City had a common policy"); *McGlone v. Contract Callers, Inc.*, 49 F. Supp. 3d 364, 367 (S.D.N.Y. 2014) ("Courts have found opt-in plaintiffs similarly situated in large off-the-clock cases despite the individualized issues such cases present even where individualized testimony into damages is required.") (internal quotation marks omitted); *Alonso*, 2011 WL 4389636, at *3 ("[I]ndividual differences in the number of hours worked or diligence in the use of the timekeeping system will not warrant decertification, as long as Plaintiffs show they are subject to a single decision, policy, or plan.") (internal quotation marks omitted). I note also that Defendants failed to move for decertification between the time of my March 13, 2019 Opinion & Order determining that Plaintiffs were similarly situated and the trial in October 2019, even though the discovery period did not close for months after my March 13, 2019 decision, (*see* Doc. 105.) *See, e.g., Lynch v. City of N.Y.*, No. 16-cv-5677 (KBF), 2017 WL 4877425, at *2 (S.D.N.Y. Oct. 27, 2017) ("At the second step, defendant has the opportunity to move for decertification if, after additional discovery, the record shows that the opt-in plaintiffs are not, in fact, similarly situated to the

named plaintiffs."); *Thind v. Healthfirst Mgmt. Servs., LLC*, No. 14 Civ. 9539 (LGS), 2016 WL 7187627, at *4 (S.D.N.Y. Dec. 9, 2019) (similar).

In light of the jury's finding that Plaintiffs were subject to a common policy or practice, and my decision *supra* not to disturb the jury's finding, I have no grounds to reconsider my finding that Plaintiffs are similarly situated.

### 2.   Evidence and Argument Regarding Prior Litigation

Defendants argue that I made a substantial error in ruling on an evidentiary issue regarding an earlier case involving the City.  Plaintiffs sought to introduce evidence of a settlement in *Conzo v. City of N.Y.*, No. 05-cv-705, a FLSA action in the Southern District of New York in which the plaintiffs alleged that the City and FDNY failed to compensate employees for required pre- and post-shift overtime work.  I granted in part and denied in part Defendants' motion in limine to exclude evidence pertaining to *Conzo*.  In doing so, I ruled that Plaintiffs could not refer by name to *Conzo* or allude to prior litigation, but rather could state only that the City had been put on notice that EMTs and Paramedics believed they were improperly uncompensated for pre- and post-shift work.  Defendants argue that my decision to allow Plaintiffs to make this argument to the jury without reference to *Conzo* was prejudicial because it allowed Plaintiffs to "insinuate[e] that the City had been sued before on the exact same issues" and that "prior litigation could be elicited without mentioning the word 'lawsuit.'" (Doc. 319, at 18–19).

"The trial court should exclude evidence on a motion *in limine* only when the evidence is clearly inadmissible on all potential grounds."  *United States v. Ozsusamlar*, 428 F. Supp. 2d 161, 164 (S.D.N.Y. 2006).  That said, "[c]ourts routinely exclude 'evidence relating to previous litigation involving one or both of the same parties' where the merits of those prior litigations

would 'become inextricably intertwined with the case at bar,'" as "[t]he jury could easily confuse any evidence regarding the merits of [a prior action] with the merits of this case." *MF Glob. Holdings Ltd. v. PricewaterhouseCoopers LLP*, 232 F. Supp. 3d 558, 568 (S.D.N.Y. 2017) (quoting *Arlio v. Lively*, 474 F.3d 46, 53 (2d Cir. 2007)).  While prior settlement agreements are inadmissible "to prove or disprove the validity or amount of a disputed claim," Fed. R. Evid. 408, I also determined it would be unfairly prejudicial for Plaintiffs to introduce prior settlement agreements for any purpose, *see* Fed. R. Evid. 403.

Nevertheless, there is a significant difference between those circumstances and what I permitted in this litigation.  My pre-trial ruling ensured that Plaintiffs could 1) not reference any litigation whatsoever, and 2) state only that Defendants were on notice about previous claims, rather than stating that Defendants had already conceded liability or a court had already made a decision on the merits.[4]  This District has acknowledged that courts may sometimes permit evidence "involv[ing] earlier claims against a defendant, which were said to put defendants on notice as to the potentially unlawful nature of its practices or products."  *Hart v. RCI Hospitality Holdings, Inc.*, 90 F. Supp. 3d 250, 286 (S.D.N.Y. 2015); *see also Bromfield v. Bronx Lebanon Special Care Center, Inc.*, NO. 16 Civ. 10047 (ALC) (SLC), 2020 WL 8461510, at *2 (S.D.N.Y. Oct. 26, 2020) (citing *Hart* for proposition that courts could "determin[e] that prior court decisions would be admissible through judicial notice."); *Hernandez v. Hacienda Mexicana Corp.*, No. 17-CV-5608 (NSR), 2018 WL 6427639, at *3 (S.D.N.Y. Nov. 6, 2018) (citing *Hart* for proposition that courts can "allow[] in knowledge about other cases in order to establish that *the relevant decision makers* had notice that could prove [defendants'] willfulness.").  As such,

---

[4] Both distinctions render Defendants' citation to *Coleman Motor Company v. Chrysler Corporation*, 525 F.2d 1338 (3d Cir. 1975), unavailing.  (*See* Doc. 319, at 21–22.)  In *Coleman Motor Company*, the Third Circuit determined that "[t]he admission of a *prior verdict* creates the possibility that the jury will defer to the earlier result and thus will, effectively, decide a case on evidence not before it."  *Id.* at 1351 (emphasis added).  Here, the jury was not informed of any prior litigation or that any court had issued an adverse verdict.

although I disagree with Defendants' suggestion that "'[o]n notice' clearly became the code word for 'lawsuit'" such that the jury became aware of prior litigation, (Doc. 319, at 18), I likely even had discretionary authority to permit Plaintiffs to reference *Conzo* explicitly, if only for the limited purpose of establishing that the City was on notice of prior allegations of unlawful conduct.  If anything, by preventing Plaintiffs from referencing *Conzo* by name or referencing previous litigation explicitly, I went further than necessary to protect Defendants from unfair prejudice under Rule 403.  I do not find any error in my ruling on Defendants' motion *in limine* at issue here.

### 3.   Evidence Introduced in Plaintiffs' Counsel's Opening Statement

Defendants further state that Plaintiffs' counsel improperly "introduce[d] evidence in her opening statement" and "published to the jury five exhibits that were not yet admitted into the trial record." (Doc. 319, at 22.)  Here, Defendants are making a legally strained argument given that the opening statement is designed as a "vehicle" for counsel "to 'help' the jury gain an overview of anticipated evidence as well as a preview of its theory of each defendant's culpability."  *United States v. Garcia*, 413 F.3d 201, 214 (2d Cir. 2005); *see also Boytion v. Phillips*, No. 03-CV-1466 (JFB), 2006 WL 941793, at *8 (E.D.N.Y. Apr. 12, 2006) ("[T]he prosecutor's opening and closing remarks were not improper.  During opening, the prosecutor merely provided a preview of her case and the evidence that was to be set forth at trial.").  "Such an overview [of anticipated evidence] present[s] no risk of prejudice" in instances where "the jury was specifically instructed that the opening statements of counsel are not evidence." *Garcia*, 413 F.3d at 215 (internal quotation marks omitted); *see also Roa v. Portuondo*, 548 F. Supp. 2d 56, 83 (S.D.N.Y. 2007) (arguing that opening statement not prejudicial to defendant because presiding judge "specifically cautioned the jury prior to opening statements that what

counsel for either party said was not evidence, but simply a preview of what each side intended

to prove by way of evidence in the case.") (internal quotation marks omitted).  As Defendants

acknowledge, (Doc. 319, at 23), I gave such an instruction before opening statements:

specifically that "statements and arguments by the lawyers are not evidence" and that opening

statements "are intended to tell you what [counsel] think the evidence proves and how they think

you should analyze the evidence."  (Tr. 33:24-34:3; *see also id.* 34:5-6 ("you should under no

circumstances consider [opening statements] as evidence.").)

Defendants argue that Plaintiffs' counsel's behavior was objectionable because "she

actually introduced evidence into the record via her opening statement and stated to the jury what

the exhibits mean."  (Doc. 319, at 25.)  Absent guidance from the Second Circuit that more

clearly defines the distinction between properly "previewing" evidence and improperly

"testifying" to that evidence during one's opening statement, I cannot agree with Defendants that

Plaintiffs' counsel's behavior during her opening statement was improper.  Given (1) the wide

discretion attorneys have to preview evidence in their opening statements, (2) my unambiguous

instruction to the jury that they "should under no circumstances consider" the opening statement

"as evidence," and (3) the fact that all the exhibits in question were ultimately introduced in

evidence, I do not agree with Defendants that Plaintiffs' opening statement constitutes

"prejudicial behavior [that] tainted the jury from the beginning of trial."  (*Id.*)

### 4.  Admitting Performance Evaluations of Non-Testifying Plaintiffs

Defendants object to the introduction of several performance evaluations for non-

testifying Plaintiffs, which Defendants argue 1) constitute inadmissible hearsay, and 2) was

either irrelevant under Rule 401 or unfairly prejudicial under Rule 403, to the extent they served

only "to distract and confuse the jury."  (*Id.* at 25–26.)  Neither argument is convincing.

The performance evaluations are not hearsay for two reasons.  First, I agree with Plaintiffs, (Doc. 327, at 27), that the performance evaluations were offered not for their truth, but to establish that Defendants were on notice, and/or had knowledge of the fact, that Plaintiffs were performing pre-shift work.  *See* Fed. R. Evid. 801(c)(2) (hearsay statements are only those that are offered "to prove the truth of the matter asserted").  Second, the performance evaluations constitute non-hearsay statements by an opposing party's agent or employee, *see* Fed. R. Evid. 801(d)(2)(D), because the performance evaluations at issue were prepared by FDNY lieutenants and approved by FDNY captains, (*see* Tr. 1207:11-1208:20).  Even if these statements were hearsay, they fall into the business records exception to hearsay, a determination I made at trial, (*see* Tr. 1215:20), and an exception that applies whether or not the declarant is available as a witness, *see* Fed. R. Evid. 803(6).[5]

I see no reason—and Defendants provide little, if any, explanation—why the performance evaluations would "distract and confuse the jury" such that they should be excluded.  (Doc. 319, at 26.)  In fact, when Defendants objected to these performance evaluations at trial, they did so based on hearsay, lack of foundation, and personal knowledge grounds, but they never mentioned Rule 403 or the evaluations' likelihood of confusing or distracting the jury.  (*See* Tr. 1213:3-8, 1214:7-17.)  As noted *supra*, far from being confusing or distracting, the performance evaluations provided the jury with official reports that addressed whether, and to what extent, Defendants had prior knowledge that Plaintiffs were performing uncompensated pre-shift work.  There is no reason to exclude this evidence on Rule 403 grounds.

---

[5] On reply, Defendants failed to address Plaintiffs' arguments that the performance evaluations are non-hearsay under Rule 801(d) or exempted as business records under Rule 803(6).  (*See* Doc. 329, at 13–14.)

### 5.   Admission of Dr. Lanier's Expert Testimony

Defendants next argue that I should have excluded the testimony of Plaintiffs' expert Dr. Louis Lanier, on relevance and reliability grounds.  (Doc. 319, at 26–29.)  Defendants' argument fails on both procedural and substantive grounds.  First, Defendants' motion is untimely, as it comes well after trial and the close of evidence.  *See Amorgianos v. Amtrak*, 303 F.3d 256, 264 (2d Cir. 2002).  Defendants note that, when they filed a motion to strike portions of Dr. Lanier's testimony at the end of trial, I declined to deny that motion on timeliness grounds.  (Doc. 329, at 14–15.)  At the time, however, I also did not determine that Defendants' motion was timely, and I noted that "there's no question that Defendants were aware of the subject matter and the methodology of Dr. Lanier's testimony in light of his preparation of expert reports and his [prior] deposition," and that "certainly it could be argued that therefore the current motion . . . is in essence a delayed motion pursuant to *Daubert*."  (Tr. 1724:6-14.)  In light of this, this *Daubert* motion—filed months after final judgment in this case after Defendants failed to file a pre-trial *Daubert* motion—is untimely.  This is particularly true given that Defendants filed a pre-trial motion in limine on other grounds as to Dr. Lanier's testimony.  (Doc. 233, at 29–31.)

Defendants' motion also fails on substantive grounds.  When I denied Defendants' earlier motion to strike, I noted that Defendants' argument "go to the weight of the doctor's testimony and not the admissibility."  (Tr. 1724:15-17); *see Sinkov v. AmeriCor, Inc.*, 419 F. App'x 86, 90–91 (2d Cir. 2011) (arguments that "go to the weight, not the admissibility" of expert testimony are "one[s] for the jury" to sort out) (internal quotation marks omitted).  Defendants' argument in its Rule 59 motion is, essentially, a condensed version of the motion it submitted in October 2019; indeed, most paragraphs appear to have been lifted directly from the earlier motion.  As such, there is no reason to depart from my earlier ruling denying Defendants' motion to strike

any parts of Dr. Lanier's testimony, which the jury was free to accord the weight it saw fit.

### 6. Curative Instruction Regarding Chief Fields' Testimony

Defendants next argue that I erred in failing to adopt their curative instruction regarding

the testimony of Chief Michael Fields, who Defendants designated as their witness pursuant to

Fed. R. Civ. P. 30(b)(6).  Defendants had twice produced Chief James Booth as their Rule

30(b)(6) witness for depositions in 2015 and 2017, but by the time this case went to trial in

October 2019, Chief Booth had retired from the FDNY.  Consequently, the parties entered into a

stipulation in which Defendants agreed to replace Chief Booth with Chief Fields as their Rule

30(b)(6) witness at trial.  (Doc. 328-17.)  In that stipulation, the parties agreed that "[D]efendants

will be bound by Chief Booth's Fed. R. Civ. P. Rule 30(b)(6) testimony" from both the 2015 and

2017 depositions, (*id.* ¶ 3), and that "Plaintiffs may use previous Fed. R. Civ. P. 30(b)(6) witness

Chief James Booth's deposition to bind the City and, if necessary, impeach Chief Fields at trial"

regarding, among other things, the two previous depositions in this case, (*id.* ¶ 4).

At trial, after Chief Fields stated that he did not recall answering a particular question at

his prior deposition, (Tr. 1062:3-18), I held a sidebar outside the presence of the jury with the

parties and the witness.  During this conversation, I explained to Chief Fields that Chief Booth

was "produced as a witness for the City and the Fire Department and gave certain answers" at

prior depositions, and that the parties had agreed that Chief Fields "would be bound by those

answers."  (Tr. 1072:21-24.)  I informed him that he might be asked the following questions:

"Were you deposed in this case?  And were you asked this question and did you give this

answer?"  (Tr. 1073:9-11.)  I noted that when he answered those questions, as a Rule 30(b)(6)

witness, he would be "bound by" the answers from Chief Booth's prior testimony and that "the

parties have agreed that in connection with your appearance and your testimony that basically

18

you would adopt all of [Chief Booth's] answers" from those depositions.  (Tr. 1073:11-13, 1074:14-16.)  In response, Chief Fields indicated that he understood me, responding, "Got you." (Tr. 1074:18.)  Plaintiffs' counsel later asked whether she should do "a practice question" to make sure Chief Fields fully understood the process, to which Defendants' counsel stated that it was not necessary.  (Tr. 1075:7-9.)

Days after Chief Fields' testimony, Defendants requested that I provide a curative jury instruction that aimed to resolve any "confusion" the jury might have about the unusual situation surrounding Chief Fields and the legal fiction—to which Defendants had agreed—that he had testified previously in the 2015 and 2017 depositions.  (*See* Tr. 1381:17-1382:10.)  I later denied Defendants' request.  (*See* Tr. 1525:21-1526:5.)  Defendants now argue that my decision not to grant this jury instruction allowed Plaintiffs to engage in "improper impeachment," which was prejudicial.  (Doc. 319, at 31.)

I maintain that such a jury instruction was neither warranted nor appropriate.  Defendants agreed, in plain terms and in a signed stipulation, that Plaintiffs could use the prior deposition testimony to impeach Chief Fields.  As such, it was Defendants' obligation alone to prep Chief Fields adequately for trial, with full understanding and awareness of the stipulation the parties agreed to months prior.  In the middle of his testimony, I explained to Chief Fields the arrangement, and Plaintiffs even offered to run through a practice question with the witness— without the jury being present—to ensure he understood the concept.  Plaintiffs had every right—under the Rules of Evidence and the parties' stipulation—to impeach the witness based on prior Rule 30(b)(6) testimony, and any *ex post* attempt to now go back on that agreement is not warranted and would be prejudicial to Plaintiffs.

Defendants appear to acknowledge that Plaintiffs had the right to impeach Chief Fields, (Doc. 329, at 17), but suggest that Plaintiffs' manner of impeachment "violat[ed] the Court's directive regarding the manner to impeach" in a way that was prejudicial, (Doc. 319, at 31). Defendants are mistaken:  I issued no such "directive" about the "manner" in which Plaintiffs could impeach the witness.  As a way to explain the Rule 30(b)(6) legal fiction to Chief Fields in our sidebar, I stated that Plaintiffs' counsel "may ask you . . . were you deposed in this case? And were you asked this question and did you give this answer?"  (Tr. 1073:4-11.)  In context, this was clearly not a restriction that I placed on Plaintiffs' manner of impeachment—*i.e.*, I was not telling Plaintiffs and the witness that these were the only questions that could be used for impeachment purposes—but rather a couple of examples to further elucidate the Rule 30(b)(6) process to Chief Fields.  Moreover, the stipulation agreed to by the parties did not mention anything about any restricting the language used to impeach Chief Fields.  (*See* Doc. 328-17.) Plaintiffs were obviously within their right to impeach Chief Fields by asking him standard-issue impeachment questions inquiring about whether "[y]ou were deposed previously," and that, when he was deposed, whether he gave such answers "under penalty of perjury."  (Tr. 1085:4-5, 1085:24-1086:2.)

Defendants similarly object to Plaintiffs stating that Chief Fields "lied" during their closing argument.  (Doc. 319, at 31 (citing Tr. 2056:2-10)).  But again, Plaintiffs were within their right to call into question Chief Fields' credibility; this is, of course, the very purpose of impeachment testimony.  Further, Plaintiffs' counsel made clear in open court that they honestly believed that Chief Fields was, at times, not merely confused by his Rule 30(b)(6) role and was actually lying.  (Tr. 1384:13-1385:14.)

Defendants had several options with how to proceed in light of Chief Booth's unavailability for trial.  First, they could have entered into a stipulation with Plaintiffs that the parties would stand on the previous Rule 30(b)(6) deposition testimony.  Second, they could have agreed to a hybrid situation where they stipulated to admit Chief Booth's testimony and permitted limited questioning of Chief Fields.  Finally, they could have registered objections to Plaintiffs' questioning that they now find objectionable.  Instead, they chose to agree to terms with Plaintiffs on a stipulation that, by its clear terms, permitted Plaintiffs' conduct, and failed to timely object to any particular questions at issue.  Neither Defendants nor I are properly "in a position to tell [Plaintiffs] how to prove [their] case."  *Gov't Emps. Ins. Co. v. Anikeyev*, No. 14-cv-3775 (KAM) (SMG), 2016 WL 1275042, at *7 (E.D.N.Y. Mar. 31, 2016).

### 7.  Jury Instruction Regarding Exchange of Equipment

Defendants argue that I erred in instructing the jury that the time that Plaintiffs spent exchanging equipment at the end of the shift was not de minimis.  (Tr. 2014:12-15.)  Defendants argue that while I have the authority to decide as a matter of law whether exchanging equipment at the end of a shift constitutes "work," the jury has the authority as the factfinder to determine how much time was spent on that work.  (Doc. 319, at 34 (citing *Holzapfel v. Town of Newburgh*, 145 F.3d 516, 521 (2d Cir. 1998)).)

 "The law of the case doctrine forecloses reconsideration of issues that were decided—or that could have been decided—during prior proceedings."  *Doe v. East Lyme Bd. of Educ.*, 962 F.3d 649, 662 (2d Cir. 2020) (internal quotation marks omitted).  The doctrine "expresses a general reluctance, absent good cause, to reopen rulings that the parties have relied upon." *Tischmann v. ITT/Sheraton Corp.*, 145 F.3d 561, 564 (2d Cir. 1998).  While the law of the case doctrine is "discretionary," courts should not revisit issues they have already ruled on absent

"exceptional circumstances." *Gaus v. Conair Corp.*, No. 94 CIV. 5693(FM), 2002 WL 15647, at *5 (S.D.N.Y. Jan. 4, 2002).

Defendants do not acknowledge that, in my summary judgment order in this case that I decided before trial, I found "that the time spent on exchanging equipment or narcotics is not de minimis." *Perry v. City of N.Y.*, No. 13-CV-1015 (VSB), 2018 WL 1474401, at *4 n.5 (S.D.N.Y. Mar. 26, 2018).  In other words, I already determined that "there is no genuine issue as to any material fact" with regard to this issue, which therefore permitted me to make a judgment "as a matter of law."  *Id.* at *2 (quoting *Fay v. Oxford Health Plan*, 287 F.3d 96, 103 (2d Cir. 2002)).  Before trial, I had already determined that there were not unresolved factual issues with regard to the exchanging equipment issue, and thus the law of the case compelled my jury instruction.  Any decision I might make to reconsider this summary judgment ruling is discretionary, and therefore my jury instruction cannot constitute legal error.  Upon further review of the trial record, I do not see any "exceptional circumstances" that would cause me to exercise my discretion to revisit and/or reverse my earlier summary judgment ruling.

### 8.  The Jury's Award

The Second Circuit provides that courts "may set aside a jury's award only if it is so high as to shock the judicial conscience and constitute a denial of justice." *Restivo v. Hessemann*, 846 F.3d 547, 587 (2d Cir. 2017) (internal quotation marks omitted).  "[W]hen damages are awarded, calculation of damages is the province of the jury." *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 671 (2d Cir. 2012) (internal quotation marks omitted).  Defendants argue that the jury's verdict awarding, in part, $7,238,513 in backpay, nearly $6 million of which was based on Plaintiffs' unpaid minutes claim, was excessive such that a new trial is warranted, or at least remittitur.  (Doc. 319, at 36.)

As a preliminary matter, Plaintiffs are incorrect, (*see* Doc. 327, at 41), that Defendants waived this argument in light of the fact that Defendants stipulated to the backpay damages award, (*see* Doc. 299).  The parties' stipulation makes clear that "[t]he parties agree that defendants' willingness not to dispute the backpay amount at this juncture is not a waiver of any right to file post-trial motions, any argument to be set forth in any post-trial motion and/or the right to appeal any of the Court's decisions in this case." (*Id.*)

Nevertheless, I do not believe that this verdict comes close to the high bar necessary to "shock the judicial conscience."  Defendants' chief argument is that this backpay constitutes a "windfall" because some Plaintiffs testified that they did not work during the non-compensable time logged in CityTime.  (*See* Doc. 319, at 37–39.)  Yet Defendants mischaracterize at least some of the trial testimony at issue; while several Plaintiffs stated that they did not submit overtime requests for pre or post-shift work, they did not testify that they were not working during that time.  (*See* Tr. 647:2-22 (Plaintiff Bellido acknowledging that she did not put in an overtime request for the 13 minutes between her shift ending and her clocking out, but not stating clearly that she failed to do so because she was not working); Tr. 1374:1-4 (Plaintiff Cruz noting that it was only her practice to request overtime "[m]ost of the time" for post-shift work); 1686:20-1687:5 (Plaintiff Pfeiffer noting that she arrived 11 minutes early on a particular day but "didn't request any overtime for anything that [she] did prior" to her shift "because we don't get compensated for that.").)

Ultimately, Defendants, at best, have testimony from a small number of Plaintiffs suggesting that they were not working for some of the non-compensable time listed on CityTime. (*See* Tr. 907:10-22.)  Such limited testimony, in a case involving more than 2,500 Plaintiffs, does not come close to meeting the high threshold required here.  Indeed, Defendants themselves

repeatedly downplay the amount of the backpay award, noting that it "represents just 3.5% of the total amount of overtime compensation paid to Plaintiffs during the applicable time period." (Doc. 319, at 11; *see also id.* (arguing that "overtime underpayment found by the jury" was "relatively small . . . in comparison to the tens of millions of dollars paid by the City to Plaintiffs in overtime"); Doc. 329, at 6 (similar).)  Defendants cannot have it both ways, and, in any event, any potential discrepancies for isolated Plaintiffs are marginal.

Defendants next argue that Questions 3 and 4 on the verdict sheet were misleading and led to an excessive verdict.  (Doc. 319, at 39–40.)  Defendants had proposed questions asking whether Plaintiffs "prove[d] by the preponderance of the evidence that all the [pre- and post-shift] time captured in CityTime as noncompensable/uncompensated time (up to 15 minutes) is time worked," and, if the jury answered "no," it would have the opportunity to provide the number of minutes per day that Plaintiffs did establish as unpaid work time.  (Doc. 320-9.)  Instead, Questions 3 and 4 asked whether Plaintiffs "prove[d] by the preponderance of the evidence that the CityTime system accurately captures the unpaid [pre- and post-shift] work minutes at issue in this case."  (Doc. 269.)  Defendants argue that this latter wording confused the jury, who submitted a note asking whether the question was trying to ask "whether the CityTime system documentation of preshift work time should all be considered work time" or whether "the preshift work time in question is accurately captured in CityTime."  (Tr. 2120:21-2121:4.)  Plaintiffs respond by arguing that—in light of Defendants' obligation under FLSA to accurately record employees' work time and the continuous workday rule, in which FLSA requires that certain otherwise non-compensable activities must be compensated if they take place during a continuous workday, *see IBP, Inc. v. Alvarez*, 546 U.S. 21, 37 (2005)—the jury's affirmative answer to Questions 3 and 4 adequately represents that "all minutes recorded by the

[CityTime] system represent compensable work time," (Doc. 327, at 44).  Defendants' argument here similarly fails because there is insufficient record evidence to indicate that a substantial amount of pre-shift time recorded in CityTime as non-compensable time was, in fact, improperly designated.

**IV.**    **Conclusion**

Defendants' motion for judgment as a matter of law or, in the alternative, motion for a new trial or an amended judgment, is DENIED.  The Clerk's office is directed to terminate the open motion at Document 318, and this case remains closed.

SO ORDERED.

Dated: August 5, 2021
      New York, New York

                                                 Vernon S. Broderick
                                          United States District Judge